## UNITED STATES v. ABBOTT et al.

### No. 11.

Circuit Court of Appeals, Second Circuit.

April 7, 1937.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for appellants Abbott and Warms.

Lamar Hardy, U. S. Atty., of New York City (F. W. H. Adams, Joseph Prendergast, and Walter B. Lockwood, all of New York City, of counsel), for the United States of America.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The above-named defendants were all convicted of violating section 461, title 18, United States Code (18 U.S.C.A. § 461) which reads as follows:

"*Loss of life by misconduct of officers of vessels; liability of corporation officer.* Every captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, and every owner, charterer, inspector, or other public officer, through whose fraud, neglect, conni-

vance, misconduct, or violation of law the life of any person is destroyed, shall be fined not more than $10,000, or imprisoned not more than ten years, or both. When the owner or charterer of any steamboat or vessel shall be a corporation, any executive officer of such corporation, for the time being actually charged with the control and management of the operation, equipment, or navigation of such steamboat or vessel, who has knowingly and willfully caused or allowed such fraud, neglect, connivance, misconduct, or violation of law, by which the life of any person is destroyed, shall be fined not more than $10,000, or imprisoned not more than ten years, or both."

The defendants Eben S. Abbott and William F. Warms are the only defendants who have appealed. The former was the chief engineer and the latter the master of the steamship Morro Castle that met with disaster on September 8, 1934, from a fire which arose when she was off the New Jersey coast and en route from Havana to New York. As a result of the fire and the panic which ensued, upward of one hundred of those on board were burned to death or drowned.

The Morro Castle had 318 passengers and a crew of 231. Robert R. Wilmott was her master when she sailed from Havana for New York, but he died about 7:45 p. m. on September 7, 1934, and Warms, being the chief officer, took over the command of the vessel. Wilmott had been master since November, 1930, and Warms mate since April, 1932. Probably just before 3 a. m. on September 8, 1934, Warms was notified by two night watchmen and a sailor named Dunn that smoke was issuing from a ventilator on the port side of the bridge deck and that there was a fire in the writing room. Warms himself then went to the place where the ventilator came out on the bridge deck and saw smoke issuing from it. Thereafter the indicator on the bridge showed the spread of fire to other parts of the ship and Warms rang the fire alarm and sent one Welch, the bridge lookout, below to arouse the boatswain and crew and also told acting third officer Hansen to take care of the passengers. At about the same time he had a CQ or "standby" signal sent out by the radio operator. The first and second officers, whom Warms had sent down to deal with the fire, thereafter reported that it was out of control and at 3:18 a. m. Warms ordered an S O S

issued. The government's contention is that he learned of the fire at 2:40 and that in spite of its gravity he neglected to send out the S O S for over half an hour and also that he was unduly slow in sending in the fire alarm. There was evidence, on which the government relies, that he neglected to follow up his orders in respect to the passengers and failed to give directions to have them taken to the starboard lifeboats on A deck, and that as a result of the delay many of them jumped into the sea and were drowned and others were burned to death, although six lifeboats were safely launched and reached the shore carrying about 90 members of the crew and only 7 passengers and to a great extent unoccupied. It is charged that Warms failed to see that directions were given to close the fire screen doors to prevent the spread of the fire, or to put water in the fire lines. His answer to those charges was in substance that other officers of the ship had been sent to do whatever was necessary to fight the fire. But the lack of proof that he did much either to supervise these matters or to see that the other officers were attending to their duties and that passengers were placed in the lifeboats may have left the question whether he was guilty of negligence which caused loss of life one for consideration by the jury. His answer to the last charge is that he gave the signal to abandon ship at 3:10 a. m. and ordered the second officer to take charge of the manning of the boats.

The fire spread with great rapidity and cut off many of the passengers from access to the boats, but, in spite of the fact that the responsibility of Warms as master of the vessel was a new one, that the situation required management of passengers and crew in a terrible emergency, and that he maintained the best traditions of the sea by staying on his vessel until the bridge had burnt under him and no one else remained on board, it may be that there was enough proof of negligence, rather than of mere errors in judgment, to justify submission of the case against him to a jury. We do not need to decide this difficult question which depends on reasoning after the event about what ought to have been done at a time of storm and stress where the considerations for action were conflicting and doubtful.

The chief difficulty in sustaining Warms' conviction is that some of the most important charges of neglect submitted

to the jury were his alleged failure when acting as mate during the years he was on the vessel before the fire to conduct proper fire and boat drills. It is said that the neglect to hold proper drills accounted for the confusion and inefficiency of the crew when the fire broke out and contributed to the great loss of life. There was proof that the drills had been inadequate and failed to comply with the regulations. But we think it cannot be said that the duty to regulate these drills devolved upon Warms and are of the opinion that he was only liable for neglect in so far as the conduct of drills was assigned to him and he failed properly to carry out what thus came within his province. Not only was Warms' testimony to the effect that the drills were always in the presence of Wilmott, who ordered them and was on the bridge whenever they were in progress, but the testimony of Welch, Dunn, Bernhardt, and Dinne tended to confirm what Warms said. The evidence we think tends to show that Wilmott was in general charge of the drills before Warms joined the ship and that after the advent of the latter he continued his former practice. Wilmott, and not Warms, told the operating vice president of the line that he had decided not to lower the lifeboats to the rails, and Wilmott it was who excused the purser and the chief engineer from attendance. Moreover, it seems unlikely that, if Warms was in general charge, he would have been personally engaged in such routine activities as routing out members of the crew to take part in the drills. The fact that he at times gave orders respecting the drills in the presence of the captain does not negative, but rather confirms, the absolute control of the latter. It was certainly wholly consistent with such control and makes any conclusion to the contrary highly speculative. The mere fact that Warms directed certain drills and that the drills (held as they were in the presence of the master) were inadequate is not sufficient to enable a jury to find that everything about them was assigned to him or that he had general control of their extent, especially in a criminal case where guilt must be established beyond a reasonable doubt. It seems reasonably certain that when drills are conducted under the eyes of the master, the kind of drills held must be regarded as fixed by his direction. The duty is placed by the regulations directly upon him, and he alone is subject to a fine if the drills are not carried out (U.S.C. title 46, §

481 [46 U.S.C.A. § 481]). Regulation 18 of Rule V of the Board of Supervising Inspectors provides that: "it shall be the duty of the master, or of the mate or officer next in command (once) at least in each week, to call all hands to quarters and exercise them in discipline, and in the unlashing and swinging out of the lifeboats, weather permitting, and in the use of the fire pumps, and all other apparatus for the safety of life on board of such vessel, with especial regard for the drill of the crew in the method of adjusting life preservers and educating passengers and others in this procedure * * *." In view of the nature of the organization of a ship's company, we think that this regulation imposes duties on the master and only affects subordinates when and in so far as there has been an assignment of duties by the master to them. It would be against all theories of maritime law that a mate should have any power or duty to control drills when the captain of the ship was on board unless the latter had delegated to him the authority. Not only is the above applicable to fire and boat drills but to the instruction of passengers in the use of life preservers. There is no evidence that Warms had that duty, which seems, by the direction of the master, to have been one of the stewards'. The same thing is true of drilling men in the use of oars, as was done at Havana Harbor by order of the master. Wilmott apparently exercised control at all times. Indeed, the hesitation of the trial judge to believe that Warms was given control of drills by Wilmott is shown when he said at the time of sentence: "There is a grave question in my mind whether Warms assumed the duty and task of the discipline of the crew or whether he merely carried out certain directions in that regard, as imposed upon him by the captain."

Now if we are right in concluding that the duty to conduct drills in accordance with the regulations devolved upon the master and any evidence that it devolved upon Warms was unsubstantial, then it was error for the court to leave it to the jury to determine whether the duty to conduct such drills was imposed upon the latter (Fol. 12375-6). This error in the charge was challenged by an exception (fols. 12393-4) as well as by the refusal to charge defendant's request No. 33. Accordingly we think that the judgment must be reversed as to the defendant Warms.

We think the situation of the appellant Abbott is similar. He was charged (1)

with failure to train the men in his department, (2) with neglect to go to his fire station at the time of the fire, (3) with neglect to maintain adequate water pressure, (4) with neglect to provide passengers with life preservers, and (5) with neglect of duty after he left the ship while he was in the lifeboat.

The first criticism must fail as there was no proof that the men in the engine room did not do their work properly. Those in the engine department, not assigned to engine-room duty, doubtless were immediately under Abbott, but we find no proof that any of them failed in fighting fire or that Abbott could have done anything with them individually or as a unit that was not done. This answer may also be made to the second criticism. The evidence shows that Abbott was excused from attendance at boat drills which, as well as the fire drills, were under control of the master.

The obligation to maintain water pressure was doubtless that of Abbott, but pressure was maintained until the fire prevented the electric pumps from working and it became inadequate only after the opening, in order to put out the widespread conflagration, of more hydrants than the system would stand. Even when the engine force was compelled to leave the engine room the steam pump was left running so that water was available for some time to protect passengers who had gathered at the after end of D deck. The claim that Abbott was responsible for furnishing life preservers to the passengers is quite without foundation and contrary to the evidence as well as to general experience. It is true that his acts on the ship during the fire seem to have been largely futile and in a practical sense were of little import except as they may have damaged his own case, but so far as we can see they could not have contributed to the death or injury of any of the unfortunate victims of the Morro Castle disaster. While he stayed out of the engine room to an almost inexplicable extent, everything there was properly managed by his subordinates and until he got into lifeboat No. 1 we are inclined to the view that he was guilty of no fault which caused the death or injury of any one.

There was evidence that Abbott was placed in command of lifeboat No. 1 by Warms. The boat left the ship with twenty-nine members of the crew and three passengers—only about one-half its capacity—and reached shore without taking on any other persons. It may be that there were no more passengers left on the forward starboard side of the ship but there were plenty of them in the stern where they had congregated to avoid the fire in the bow. It is clear that an attempt should have been made to take them into the lifeboat. This we believe is not disputed, but it is said that Abbott was too sick from the effects of smoke and fire exhaustion to direct movements at the time, that the motor did not work and there was not enough power in the oars the seamen were pulling to bring the boat up to the stern of the ship. Whether Abbott was so disabled at the time that he could not direct operations is disputed and was a question of fact for the jury. Other lifeboats from the Luckenbach came to rescue passengers and were operated only by oars. They successfully reached the stern of the Morro Castle, took off passengers and carried them over to the Luckenbach.

It is doubtful whether the motor of the lifeboat was in fact out of commission or whether no serious attempt was made to operate it because Abbott was afraid of the danger of sparks from the steamer. Had it been put in operation there could certainly have been no difficulty in reaching the ship. We think the operability of the motor was a question of fact for the jury.

The court when dealing with the liability of Abbott charged as follows:

"As to the defendant Abbott, as chief engineer, he had charge of the engine room and the maintenance and upkeep of the machinery and appliances connected therewith throughout the ship, subject to the directions of his superior officer, the master. He had charge of the men in the engine room. There is testimony, and it is for you to weigh that testimony, that in the event of an emergency the engine room employes, not on watch, should report to him either in the engine room or at his office on the navigating deck, to receive instructions. There is testimony that he was assigned to command lifeboat number 6, and that he was relieved from that duty by Captain Wilmott. There is testimony that he was ordered from the bridge by Captain Warms and directed to take charge of lifeboat number 1, and that he did not do so, because of his physical condition, as a result of smoke and other causes. Neglect in respect to the engine room

operations is not to be attributed to the defendant Abbott, if you find that the engine room was properly operated and attended to in his absence. If the pumps in the engine room furnished all the service which they were capable of in respect to water pressure, the absence of Abbott from the engine room is not imputable to him,—he cannot be held for a mere error of judgment; but it is for you to say, upon all the testimony in this case with regard to the defendant Abbott, whether in the catastrophe that occurred on the Morro Castle on the date in question, from the time that he learned of the fire, he acted as a reasonably prudent man, considering his official position and his duties as chief engineer, would be expected to act, and whether the life of any person on board said vessel was destroyed due to his misconduct, negligence or inattention to his duties." (Folios 12368-12371.)

We have already said that in our opinion there was not sufficient evidence to go to the jury of any criminal neglect on the part of Abbott while he was on the Morro Castle which resulted in the death of any person. Yet it is entirely clear from the foregoing charge that the court instructed the jury that the conduct of Abbott while on the Morro Castle might afford sufficient basis for conviction under the statute and that no specific instructions were given as to the circumstances under which Abbott's neglect to rescue passengers after he was in command of the lifeboat might amount to criminal negligence.

In other words, the jury may perfectly well have convicted Abbott because he neglected to train the men in his department to go to his fire station or to maintain adequate water pressure or to provide passengers with life preservers though we hold that there was not sufficient evidence under any of these items. The only words in the charge which might permit a conviction because of conduct in the lifeboat were those stating generally that it was for the jury to say "upon all of the testimony * * * whether in the catastrophe that occurred on the Morro Castle on the date in question, from the time that he learned of the fire he acted as a reasonably prudent man, considering his official position and his duties as chief engineer, would be expected to act * * *."

■ In view of the insufficiency of the proof necessary to convict Abbott of misconduct while on board the Morro Castle, we think he could not be convicted for misconduct on the lifeboat under a charge which dealt with his acts thereon in such vague and general terms. It is true that there was no specific objection to the charge in respect to Abbott and that the court carefully instructed the jury that neglect was not to be attributed to him if the engine room was properly operated in his absence and if the pumps furnished all the service they were capable of in respect to water pressure. But inasmuch as there was lack of proof of criminal negligence on the part of Abbott while on board the Morro Castle, we think specific instructions as to his liability while on the lifeboat were necessary to sustain any conviction. As the excerpt from the charge shows there really were no such instructions and the following requests which were "refused, except as charged" ought to have been granted in order to render his liability for conduct while on the lifeboat intelligible:

"81. If while in the lifeboat Abbott was physically incapable of taking charge, or permitted a competent person to take charge, he may not be deemed guilty of negligence in the operation of the lifeboat because of his failure to take charge * * *."

"83. If while in the lifeboat Abbott was physically incapable of taking charge of doing work therein, the failure to rescue passengers is not attributable to him, particularly if he advised that the lifeboat be kept in the vicinity of the ship * * *."

■ We hold that in spite of the failure to except to the charge as delivered, the omission of any specific instructions as to the liability of Abbott while in the lifeboat which was raised by the foregoing refusals to charge was error. Indeed, if Abbott was to be convicted for misconduct while in the lifeboat, the instructions ought to have dealt with the issues of fact fully and clearly.

The objections based on misjoinder and duplicity are without merit.

Judgment reversed as to both Warms and Abbott.