NEW YORK & CUBA MAIL S. S. CO. v. CONTINENTAL INS. CO. OF CITY OF NEW YORK.

District Court, S. D. New York. March 12, 1940.

254

Burlingham, Veeder, Clark & Hupper, of New York City (Roscoe H. Hupper, Chauncey I. Clark, Ray Rood Allen, and Eugene Underwood, all of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & Mc-Grann and Tompkins, Boal & Tompkins, all of New York City (Cletus Keating, Arthur M. Boal, and James H. Herbert, all of New York City, of counsel), for respondent.

GODDARD, District Judge.

This is a libel by the New York and Cuba Mail Steamship Company, charterer, owner and operator of the Steamship Morro Castle to recover from the Continental Insurance Company of New York, its protection and indemnity underwriter, $1,114,-267.12 with interest as reimbursement for the losses and expenses sustained by libelant as the result of a fire on board the Steamship Morro Castle on September 8, 1934. The suit is based on respondent's insurance policy P. & I. No. C 2336, dated March 1, 1934 which covered the Morro Castle in the amount of $4,600,000 from February 20, 1934 to February 20, 1935.

The Morro Castle was a twin screw turbo-electric passenger and freight steamship 508 feet long, 70 feet 9 inches beam, built in Newport News, Virginia, in 1930. At 7:45 o'clock in the evening of September 7, 1934 while she was on one of her scheduled voyages from New York to Havana and return, and proceeding from Havana to New York, her master Robert R. Willmott died of heart disease and her chief officer, Warms, took command. At 2:10 the following morning while she was coming up the coast a fire of undetermined origin was discovered by a passenger in a locker in the writing room port side forward of B deck. At this time Warms, acting master, and the second officer were on the bridge in charge of navigation; the quarter master was at the wheel and an A. B. was standing lookout on the bridge. Although the fire was discovered at 2:10 it was not reported to the bridge until shortly before 3 o'clock. Apparently some members of the crew had attempted to extinguish it without calling for aid and when the crew were called on deck the fire had made such headway it is doubtful if it could have been extinguished. Hose was broken out on the starboard sides of A and B decks; also on C deck. The pas-

sengers were ordered aft to the lower decks to get them away from the fire. By the time it was realized that the fire was out of control it had spread to such an extent that it had cut off many of the passengers from access to the boats, many of whom were compelled to jump into the sea to escape the fire. Notwithstanding this serious situation no radio distress signal was sent out until 3:15 and then only a "stand by" signal and not until 13 minutes later was an "S. O. S." sent, although there were several vessels in the vicinity —one, the Andrea Luckenbach within .3 miles. Six life boats having a capacity of 408 passengers were launched, but after the boats were lowered into the water their crews had great difficulty in maneouvering the boats so as to keep them near the ship or to pick up those in the water. Ten passengers and 87 of the crew escaped in the Morro Castle life boats. Other passengers and members of the crew, who jumped overboard, were saved by life boats from other vessels which came to the rescue.

The result of the disaster was that of the 318 passengers on board, 81 were dead and missing and 34 members of the crew of 231 were dead or missing, and the Morro Castle became a total wreck.

At the time of the fire the Morro Castle was equipped with modern fire-fighting equipment, which included 42 fire hydrants located in various parts of the ship. These were served by three pumps—two electrically driven and a steam pump, capable of a total discharge of 600 gallons of water a minute, which, when operated at capacity, could supply any six hydrants with full pressure at the same time. She also was equipped with 105 fire extinguishers which, in number and type, conformed to the regulations. Usually these were distributed in various places on board which had been selected by the United States Local Inspectors, but at the time the fire was discovered and in violation of the regulations there were no extinguishers on B deck, for on the day previous, on orders from the boatswain, the extinguishers belonging on B deck had been removed for polishing and instead of returning them to B deck, as they should have been, they were wrapped in cloths and placed in the crew's companionways so that they would be protected from the salt air and be bright when they were returned to their proper places before the vessel docked. She carried the requisite number of life boats on Malachlan davits. These boats were properly equipped, in good condition, and had been inspected and tested by the United States Local Inspectors in February, May and August, 1934. Her required crew under certificate of inspection was 67, but she was allowed 170 additional crew, and at the time of the fire carried a crew of 231.

The policy which is admitted to have been issued includes the following provisions now pertinent:

"The Assurers hereby undertake to make good to the Assured or the Assured's executors, administrators and/or successors, all such loss and/or damage and/or expenses as the Assured, without their actual* fault or privity, shall have become liable to pay and shall pay as shipowners or as having an interest in the vessel named herein on account of the liabilities, risks, events, happenings and/or occurrences herein set forth:

"(I) Liability for loss of life of, or personal injury to, or illness of, any person, * * *.

"(2) Liability for hospital, medical, or other expenses necessarily and reasonably incurred in respect of loss of life of, personal injury to, or illness of any member of the crew or any other person. * * *

"(8) Liability for loss of, or damage to, or in connection with cargo or other property, including mail and parcel post, including baggage and personal effects of passengers, * * *.

"(14) Costs, charges, and expenses, reasonably incurred and paid by the assured in defense against any liabilities insured against hereunder in respect of the vessel named herein, * * *.

"General Conditions and/or Limitations.

" * * * that in respect of any occurrence likely to give rise to a claim under this policy, the Assured are obligated to and shall take such steps to protect his (and/or the assurers') interests as would reasonably be taken in the absence of this or similar insurance.

* * * * * *

"The Assurers shall not be liable to the Assured for any loss, damage, or expense to which the Assured, or the managing* officers of his organization are privy, or which arises from his or their act or neglect".

In its 1933–4 policy, also in its 1934–5 policy, the one sued on, "actual"* appears, but not in previous policies. "Managing"* in typewriting was inserted first in its

1931–2 policy and was continued in the other two policies. Therefore, at the time of the fire the scope of "fault or privity" was limited by the insertion of "actual" and those officers whose act or neglect might charge the corporation with privity was limited by the insertion of "Managing".

The libel alleges that claims for about $13,500,000 were made against libelant in a limited liability proceeding for loss of lives, personal injuries, and loss of property as a result of the fire, and that a settlement of these claims was effected for $890,000 after notice to respondent, and that other proper expenses and legal costs amounting to $229,817.12 were paid by libelant, and that there is due the libelant from respondent the total sum of $1,114,-267.12 with interest, which claim with proofs of loss were duly presented to the respondent in accordance with the policy; that respondent has refused payment and repudiated all liability.

The answer admits the policy, the fire and loss therefrom, and the fact that the claims were settled for $890,000; also that claim and proofs of loss with pay orders and demands for payment were made and refused. The answer denies various items in the sixteen articles of the libel, but these need not be discussed now in view of the stipulation entered into at the trial that consideration of the amount of any recovery by libelant, if any, shall be postponed until after this trial on the merits. The substance of the answer is contained in the affirmative defense portion which sets forth the description of risks clause in the policy and the privity clause, followed by the allegation that the loss "was due to, occasioned or brought about by or arose from the act or neglect of the assured and the managing officer or officers of its organization, and was a loss, damage or expense to which the assured or the managing officer or officers of its organization were privy."

The contention of the respondent is—

First—That the policy issued by the respondent was not an all-risk policy; that the policy did not insure any loss, damage or expense occasioned by actual fault or privity or by the act or neglect of any libelant's managing officers.

Second—That the libelant has the burden of proving—(I) That it became liable to pay the sums which it claims to have paid, and (2) that it became liable to pay without "actual fault or privity" and without the "act or neglect" of any of its managing officers, and that libelant has not met this burden of showing why it could not limit its liability or that it became liable to pay without its "actual fault or privity" and without the "act or neglect" of any of its managing officers.

Third—That the criminal conviction of libelant and its Vice-President, Henry E. Cabaud ("Managing Officer") in the United States District Court under § 282 of the United States Criminal Code, 18 U.S. C. § 461, 18 U.S.C.A. § 461, bars any recovery by libelant, because it establishes the fact that the claims arose because of "actual fault or privity" and by the "act or neglect" of the managing officers of the libelant.

Fourth—That aside from the criminal conviction the respondent has proved fault, privity and neglect on the part of the managing officers of the libelant in the following respects:

The Morro Castle was manned by an incompetent crew.

Captain Willmott was physically unfit to serve as master.

Warms, the first officer who succeeded Willmott, as acting master, was incompetent.

Failure to divide the sailors into equal watches in breach of Title 46 U.S.C. § 673, 46 U.S.C.A. § 673.

Failure to provide proper watchmen.

Failure to hold proper fire and boat drills.

Failure to make proper entries in ship's log in respect to fire and boat drills.

Contrary to the provisions of Title 46 U.S.C. § 464, 46 U.S.C.A. § 464, and Supervising Inspectors, Ocean and Coastwise, Rule IV, subdivision 11, a number of fire hydrants were capped and fire hose was not at all times attached to each fire hydrant.

Failure to have proper fire quarter bills and muster roll.

Failure of libelant's managing officers to inform master and chief engineer of capacity of fire pumps.

The burden rests upon the libelant to prove (I) that it became liable to pay the sums which it asserts it has paid; and (2) that it became liable to pay without "actual fault or privity" and without the "act or neglect" of any of its managing of-

ficers. Richelieu & Ontario Navigation Co. v. Boston Marine Insurance Co. 136 U.S. 408, 10 S.Ct. 934, 34 L.Ed. 398; Carles v. Travelers' Insurance Co. 238 App.Div. 43, 263 N.Y.S. 29; Western Assurance Co. v. J. H. Mohlman Co. 2 Cir., 83 F. 811, 40 L.R.A. 561. Sohier v. Norwich Fire Insurance Company Mass., 11 Allen 336.

Libelant, in an attempt to distinguish the Richelieu case, cites Moore & Co. v. Eagle Star & British Dominions Ins. Co., D.C., 5 F.2d 358, affirmed 9 Cir., 9 F.2d 296; Hanover Fire Ins. Co. of New York v. Merchants' Transport Co., 9 Cir., 15 F.2d 946, certiorari denied 273 U.S. 758, 47 S. Ct. 472, 71 L.Ed. 877; Sorenson et al. v. Boston Insurance Co., 4 Cir., 20 F.2d 640, certiorari denied 275 U.S. 555, 48 S.Ct. 116, 72 L.Ed. 423; Standard Marine Insurance Co. v. Nome Beach L. & T. Co., 9 Cir., 133 F. 636, 1 L.R.A.,N.S., 1095. But these cases involve suits on "all risk" policies, in which the rule of law is that the vessel owner cannot recover on the policy if some act of his which contributed to the loss was wilfully and grossly negligent, and not any of these cases contain decisions with respect to the burden of proof.

Taking up the various charges made by respondent—

██ I. That the libelant and its managing officers were guilty of privity and of neglect in sailing the Morro Castle on this voyage with a desperately ill master and an incompetent chief officer who "took over" the ship upon the death of the master on the night before the fire. Captain Willmott died of "acute indigestion and heart trouble" the night before the fire. I do not think that the evidence sustains the contention that any of the managing officers or the libelant were aware, or, at the time had reasonable grounds for believing, that Captain Willmott was suffering from an ailment which would cause his death or would incapacitate him from serving as master as he had done on many previous voyages. The medical report of the Morro Castle shows that during the two years preceding Captain Willmott's death he was ill but once; that was on August 30, 1934 when he suffered an attack of acute indigestion and the ship's physician, Dr. Van Zile, treated him with soda peppermint, etc. Nothing in Dr. Van Zile's report indicated that Captain Willmott's health was seriously impaired, and according to the testimony he looked to be in the best of health. Mrs. Willmott, his widow, has testified that she overheard two conversations between her husband and libelant's managing officer, Cabaud, in which her husband told Cabaud that he had heart trouble. That conversations relating to Captain Willmott's health took place is denied by Cabaud and by witnesses said by Mrs. Willmott to have been present. If such conversations took place I believe that they must have been rather casual references to Captain Willmott's health and that no one suspected that his condition was serious. Apparently neither Captain Willmott or his wife believed that his condition was such as to deem it necessary to consult a physician when on shore and no claim is made that any one ever treated him for heart trouble. His sudden death was quite evidently a surprise and shock to everyone.

██ Warms, the first officer who took over command of the Morro Castle upon Captain Willmott's death, first entered the employ of the libelant or its allied companies in 1909 as third officer and from then on was successively and almost continuously an officer or in command of vessels. During all these years of service there is nothing substantial in the record to indicate that he was not an experienced and competent officer. The fact that in 1926 his license was suspended for ten days for failing to hold a boat drill at sea because of weather conditions is scarcely enough to indicate that he was incompetent. Cf. The Volund, 2 Cir., 181 F. 643, page 666.

██ II. That libelant and its managing officers were guilty of privity and of neglect in failing to maintain the watches as required by Title 46 U.S.C. § 673, 46 U.S. C.A. § 673, which provides "§ 673. *Requirements as to watches; duties of seamen; right to discharge.* In all merchant vessels of the United States of more than one hundred tons gross, except those navigating rivers, harbors, bays, or sounds exclusively, the sailors shall, while at sea, be divided into at least two, and the firemen, oilers, and water tenders into at least three watches, which shall be kept on duty successively for the performance of ordinary work incident to the sailing and management of the vessel. * * *"

This statute applied not only to the sailors who were carried pursuant to the requirements of the inspection certificate, but also to those carried in excess of the re-

258

quirements of the certificate. Southern Pacific Co. v. Hair, 5 Cir., 24 F.2d 94. In O'Hara v. Luckenbach Steamship Co., 269 U.S. 364, 46 S.Ct. 157, 159, 70 L.Ed. 313, it is stated that the intent of Congress in passing this statute was "to provide for successive and continuous watches to be constituted in numbers as nearly equal as the sum of the whole number would permit".

The Morro Castle's certificate of inspection of May 16, 1934 called for 3 quartermasters, 15 A. B. Seamen, and 7 ordinary seamen, a total of 25 men. On this voyage she carried 3 men who signed the ship's articles as quartermasters, 14 men who signed as A. B. Seamen, and 6 men who signed as ordinary seamen. However, in addition to these, she carried a boatswain, 2 portmen, 2 carpenters, and 2 cadets who should be included so that there was no shortage in this respect.

The statute says that "the sailors shall, while at sea, be divided into at least two * * * watches", meaning that the watches should be as nearly equal in number as possible. O'Hara v. Luckenbach S. S. Co., supra. If divided into two watches there would have been twelve men in one watch and thirteen men in another watch. If divided into three watches there would have been two watches of eight men, and one watch of nine men. But it appears that 11 A. B. seamen and 3 ordinary seamen were customarily assigned to day duty—cleaning and painting the ship, who were not divided into watches at all, and that only nine men were divided into watches so that between 4 P. M. until 6 A. M. there were only nine men available. These were divided into three watches, consisting of a quartermaster, an A. B. seaman and an ordinary seaman in each watch, which was the make-up of the watch at the time of the fire, instead of the eight or nine members of the crew which the statute calls for. Libelant admits that the crew of the Morro Castle were not divided into equal watches as required by statute, and contends that such division of the crew was done under the orders of Captain Willmott and in violation of express orders issued by libelant's Marine Superintendent and unknown to any of the managing officers of the libelant. The division of watches was pursuant to the instructions of Captain Willmott. Whether any of the managing officers of the libelant were aware that this statute was being vio-

lated is an important issue. Cabaud, Vice-President, and operating manager of the libelant company, and Torresson, its Marine Superintendent, both admitted that they knew about the provisions of the statute with respect to dividing the crew into equal watches. On December 14, 1926 Torresson sent written instructions to masters of all the company's ships informing them of the recent decision of the Department of Commerce requiring that the members of crews be divided into equal watches, and called for "strict compliance with the ruling". In September, 1930 similar instructions were again sent to the masters of all the company's ships. Willmott did not receive these instructions in 1930 as he was not master of a vessel at that particular time; but Warms acknowledged in writing their receipt and these orders went into the Morro Castle's "Instruction Book" which Willmott took over with the vessel soon after, and formed a part of the company's permanent instructions to the master in charge. Torresson, libelant's Marine Superintendent, testified that so far as he knew these instructions were carried out but he never investigated to see that the watches were properly kept and that he never looked at the log books to see if his instructions were followed. Cabaud said that he never did anything about the matter except that he had instructed his Marine Department to check up with the masters. Had Cabaud, its operating manager, or Torresson, its Marine Superintendent, examined the Morro Castle's log books, the logs would not have shown whether the instructions as to dividing her crew into equal watches were being observed or were not being observed. Respondent contends that as the Morro Castle was in New York City only about eight hours each week, which made it necessary to do much of the maintenance work, such as painting and cleaning while at sea and necessarily in the day time, that Cabaud and Torresson must have realized that this would result in an unequal division of the watches; and that as Cabaud and Torresson boarded the Morro Castle each week upon her arrival in New York for some four years, that it is inconceivable that they did not know that the written instructions as to dividing the crew into equal watches were not being carried out. However, there is no proof that the maintenance work did necessitate so many sailors working in the day time as to prevent them from being divided into equal watches, any

inference that Cabaud and Torresson knew that the instructions as to dividing the sailors into equal watches was being violated, is not sufficiently strong to justify a definite finding to that effect. Furthermore, respondent contends that libelant was guilty of privity and neglect in failing to have proper watchmen on the Morro Castle as required by Title 46 U.S.C. § 470, 46 U.S.C.A. § 470, which reads "§ 470. *Watchmen on passenger steamers.* Every steamer carrying passengers during the nighttime shall keep a suitable number of watchmen in the cabins, and on each deck, to guard against fire or other dangers, and to give alarm in case of accident or disaster."

Ocean and Coastwise Rule V, subdivision 25, under the heading "Lookouts and Watchmen", provides as follows:

"All steamers navigating the ocean during the night time shall have a lookout at all times at or near the bow and one watchman in each cabin and steerage.

"All watchmen shall be under the direct charge of the master or officer in command of the vessel, and each shall report to the officer in command at the pilot house at fixed intervals of not longer than every hour.

"All passenger steamers shall, in addition to the regular pilot on watch, have one of the crew also on watch, in or near the pilot house; and this rule applies to all steamers navigating in the night time. (Sec. 4477, R.S. [46 U.S.C.A. § 470].)"

The Morro Castle's certificate of inspection required that she carry three watchmen but seven men were signed on as watchmen. But "all watchmen" were not under the direct charge of the master or officer in charge of the vessel, for only three of these were under such charge. Four of them were in charge of the second steward and took orders and reported to him. Of these three were nothing more than night stewards who merely sat in the lobby waiting to serve passengers when summoned by the ringing of the steward's bell. The fourth did perform the duty of a watchman, made the rounds and punched a watchman's clock at various stations.

There was, and libelant admits that there was, a clear violation of the regulation that "all watchmen shall be under the direct charge of the master or officer in command * * * and each shall report to the officer in command at the pilot house at fixed in-

tervals of not longer than every hour". The Morro Castle was barely ever in port here over night and Torresson denied that he either approved or even heard of this arrangement on the Morro Castle as to watchmen, and it does not appear that Cabaud knew of it.

III. Another charge made by respondent is that the libelant and its managing officers were guilty of privity and neglect in failing to have fire and boat drills held as required by statute and regulations, and in failing to take action against the officers of the Morro Castle, and had failed to make proper entries in the log books with respect to such drills as required by statute.

Title 46 U.S.C. § 481, 46 U.S.C.A. § 481, reads in part as follows:

"Musters of the crews at their boat and fire stations, followed by boat and fire drills, respectively, shall be held at least once a week, either in port or at sea. An entry shall be made in the official log book of these drills, or of the reason why they could not be held.

"Different groups of boats shall be used in turn at successive boat drills. The drills and inspections shall be so arranged that the crew thoroughly understand and are practiced in the duties they have to perform, and that all the boats and pontoon rafts on the ship with the gear appertaining to them are always ready for immediate use."

Rule V, subdivision 18 of the Board of Supervising Inspectors (which by virtue of Title 46 U.S.C. § 375, 46 U.S.C.A. § 375, has the force of law) provides in part as follows:

"*Station Bills, Drills and Reports of Masters*

"18. It shall be the duty of the officer in charge of every steamer carrying passengers and all other steamers of over 500 gross tons and subject to inspection, to cause to be prepared station bills, in which shall be assigned a post or station of duty for every person employed on board such vessel in case of fire or other disaster, which station bills shall be placed in the most conspicuous places on board for the observation of the crew. And it shall be the duty of the master, or of the mate or officer next in command once at least in each week, to call all hands to quarters and exercise them in discipline and in the unlashing and swinging out of the life-

boats, weather permitting, and in the use of the fire pumps, and all other apparatus for the safety of life on board of such vessel, with especial regard for the drill of the crew in the method of adjusting life preservers and educating passengers and others in this procedure, and to see that all the equipments required by law are in complete working order for immediate use; and the fact of the exercise of the crew, as herein contemplated, shall be entered upon the vessel's log book.

"The rule relating to fire and boat drills contemplates that such drills shall be conducted precisely as though an emergency existed. To accomplish the purpose of the rule, lifeboat covers and strongbacks shall be removed, plugs put in place, painters carried forward and secured so as to provide a good lead and slack to hold the boat in position under the davits when in the water. The hand pumps and fire pumps shall be operated long enough and a sufficient number of outlets used to insure that such equipment is in order and effectual.

\*　　\*　　\*　　\*　　\*　　\*

"The entries in the vessel's log book relating to the exercise of the crew in fire and boat drills shall state the day of the month and hour when so exercised, length of time of drill, number of boats swung out, number of lengths of hose used, and a statement of the condition of all fire and lifesaving apparatus."

When an alarm for a fire drill sounded it was the practice on the Morro Castle for the forward mooring gang to go to the forward part of the ship and for the after mooring gang to gather in her after part and to put one hose in each of the two places into operation. No other members of the crew went to fire stations. Twenty-four men in the engineers' department alone had no stations assigned to them on the "Fire Quarters Bill" and many other members of the crew had no stations assigned to them, or if assigned to one, were ignorant of it.

Some members of the crew were not familiar with the mechanism for releasing the boats from the davits and lowering them into the water; others did not know how to row. The record amply supports the conclusion that the fire and boat drills had been inadequate and failed to comply with the statutes and regulations. The neglect to conduct proper drills undoubtedly accounted for the confusion and inefficiency of the crew when the fire was reported and contributed to the exceptionally heavy loss of life. Libelant seeks to explain the failure of members of the crew to handle the boats and their inability to reach passengers who had jumped overboard and were keeping afloat with the aid of life preservers, by attributing it to the rough sea. But this is a weak excuse for boats from three other vessels were able to reach and rescue many of the Morro Castle's passengers who had jumped overboard.

The Morro Castle's log books contain entries of some 131 drills held in 1932–1934. Typical entries are as follows:

"Feb. 27, 1934—
　　4:15—Operated water tight doors.
　　4:30—Held fire and boat drill.
　　　　　Boats swung out. Motor boat engines operated 5 minutes.

"July 8, 1934—
　　4:15—Operated water tight doors.
　　4:30—Fire and boat drill held.
　　　　　Engines in motor boats operated for 5 minutes."

These entries do not strictly conform to the requirements of the regulations, for they do not state the length of time of drill, the number of boats swung out, number of lengths of hose used, and statement of condition of all fire and life saving apparatus. The log books were filed in Torresson's office and, of course, were available to both Torresson, libelant's Marine Superintendent, and to Cabaud, its managing officer. Libelant urges that Cabaud and Torresson were entitled to rely, as evidence that the drills were properly conducted, upon the fact that quarterly inspections were made by the Local Inspectors and that the master made a monthly sworn report each month to the Inspectors.

Subdivision 18 of Rule V requires that the master of passenger vessels report monthly to the Local Inspectors the dates of the exercise and drill of the crew, the condition of the vessel and her equipment. Apparently these reports were filed with the Local Inspectors. A number of such reports were produced at the trial and the testimony is that the remaining reports were lost. Moreover, had these not been filed or had they been regarded as inadequate by the Local Inspectors, they undoubtedly would have complained to the owners of the vessel and there is no suggestion of any such complaint. Then too, Subdivision 18 further provides that the Local Inspectors shall require the officers and crew of such vessels to "perform the

aforesaid drills and discipline in the presence of the Inspectors at intervals sufficiently frequent to assure the said Inspectors by actual observation that the foregoing requirements of this section are complied with". ·

■ The testimony of several Inspectors is that this requirement of the regulation was carried out at intervals during 1934. Knowing of the regulation requiring the Local Inspectors to see to it by actual observation that the statute and regulations were being complied with and that the Morro Castle was passed by the Inspectors without objection, there was reasonable ground for the managing officers of the libelant to believe that the statute and regulations were being observed in these respects. Responsibility for drills is placed by statute and the regulations directly upon the master and Local Inspectors. United States v. Abbott, 2 Cir., 89 F.2d 166.

The principal purpose of the entries in the log as to fire and boat drills was to enable Local Inspectors to check up on the performance of these duties by the ship's officers.

■ It is contended by respondent that knowledge of improper drills was, brought to Cabaud's attention in May, 1934, when he was a passenger on the Morro Castle on a voyage from New York to Havana. At that time he observed a fire and boat drill and the boats were not lowered into the water; but Cabaud's testimony is that Captain Willmott said, owing to the possible damage in lowering boats in the rough sea, he would defer that part of the drill until they reached Havana. The statute says that the weekly drill may be held "either in port or at sea". The log shows that the boats were lowered at Havana on May 22, 1934. This incident was not enough to impute knowledge to Cabaud that proper drills were not being held. The respondent also says that there is an inference that Mr. Mooney, the President of the libelant, became aware that improper drills were being held on the Morro Castle when he was a passenger on an Easter cruise from New York to Havana in April, 1934. But assuming that the drill which was held was inadequate, there is nothing to indicate that Mr. Mooney was on deck at the time or saw it take place.

■ Here again, after thorough consideration of all the evidence and the reasonable inferences to be drawn from it, I am unable to find that the libelant or its managing officers knew or had grounds for believing that the fire and boat drills for the crew of the Morro Castle had been inadequate and were not being carried out in accordance with the regulations.

■ IV. Another contention of respondent is that the libelant's managing officers were guilty of privity or neglect in failing to see that all fire hose was at all times attached as required by Title 46 U.S.C. § 464, 46 U.S.C.A. § 464, which provides generally for fire pumps and hose aboard passenger vessels, and Ocean and Coastwise Rule IV, subdivision 11 of the Rules and Regulations of the Board of Supervising Inspectors, which provides that a length of fire hose shall at all times be attached to each outlet of the fire main. Specifically respondent contends that many of the fire hydrants not only had no hose attached but were capped. The testimony ranged all the way from those who testified that all the deck hydrants were capped to those who said that none were capped. Each hydrant had a cap attached to the hydrant by a chain, and there is no doubt but that at the time of the fire the hose had been ·disconnected from several of the hydrants and those hydrants capped so that they were not ready for immediate service. The libelant admits that two hydrants had no hose attached·to them and three others not only had no hose connected but were actually capped; these were two on A deck and one on B deck, the latter being the nearest one to the writing room where the fire was first discovered. The B deck hydrant had been capped by order of Captain Willmott after leaving Havana on this voyage because the valve was leaking. The testimony is that that hydrant and another on B deck would have been used at the time of the fire had they not been capped. Certain witnesses called by respondent testified that many of the outside hydrants on the Morro Castle had been capped for some months and that as the caps were painted red, a person walking along her deck when she was at her pier could not help but observe them. However, during the examination of these witnesses they turned out to be unworthy of belief. Moreover, five United States Local Inspectors and a representative of the Department of Commerce testified that inspections had been made in February and in August, 1934 of the Morro Castle, which included the hydrants, without notice to anyone and that none of the hydrants were

capped and the hose were connected. Tending to confirm this latter group of witnesses is the admission of Captain Holden, manager of respondent's "Safety Department," that during his several inspections on board the Morro Castle he had never found a hydrant capped. Cabaud, libelant's managing officer, testified that on his weekly inspection of the ship, none of the hydrants were capped. There is testimony that when the sea sprays were in operation (for shower baths for passengers) it created additional pressure on the fire line and caused some of the fire hydrants to leak so they were capped to avoid leakage. The reasonable inference from all the testimony is that before arriving in port the caps were removed from any hydrant which had been capped and the hose again attached. There is no credible evidence that the managing officers of the libelant knew or had reason to believe that any of the hydrants were capped.

V. Respondent contends that the Morro Castle had no "Fire Quarters Bill" and muster roll as required by Title 46 U.S.C. § 481, 46 U.S.C.A. § 481, which provides that

"Special duties for the event of an emergency shall be allotted to each member of the crew.

"The muster list shows all these special duties, and indicates, in particular, the station to which each man must go, and the duties that he has to perform."

The Regulations provide that the list shall be prepared by the master of the vessel and approved· by the authority designated by the Secretary of Commerce. According to libelant's testimony the Morro Castle's muster list was approved by the local United States Local Inspectors in Norfolk before she sailed on her first voyage, checked over and approved by the United States Local Inspectors in New York in May and August, 1934, the last two inspections preceding the fire. There were Fire Station Bills posted in various parts of the Morro Castle but respondent says that these were incomplete and failed to assign fire stations to upwards of one hundred members of the crew. The Station Bills on the Morro Castle were lost in the fire. Respondent sought to introduce into evidence to support its contention what it claimed were copies of them (Exhibits A and B), but respondent failed to show that these ·were true copies of the Station Bills on the Morro Castle and therefore

were not admissible as evidence. Abbott, her chief engineer, testified that every member of the crew had a fire station.

VI. Another charge made by respondent is that libelant's managing officers failed to inform her master and chief engineer that only six of the fire hydrants could be supplied at one time with full pressure by the pumps. Both Captain Warms and Chief Engineer Abbott admitted that they had never been informed of this by the managing officers of the company and were not aware of the fact. The fire line leading to 42 hydrants was served by three pumps, with a total discharge capacity of 600 gallons a minute. The Steamboat Inspectors require only 200 gallons a minute for a ship of the size of the Morro Castle, so she had three times the required capacity, and her equipment exceeded the requirements of Rule IV, 5 of the Regulations. Six hydrants could be supplied with full pressure. If more than six were used at the· same time the pressure would be proportionately decreased.

The Morro Castle had been built with the aid of a construction loan granted under the Merchant Marine Act of 1920, as amended, 46 U.S.C.A. § 861 et seq., which provided that vessels so built "shall be fitted and equipped with the most modern, the most efficient, and the most economical engines, machinery, and commercial appliances". Her specifications were subject to approval by the Government and she was constructed by first class shipbuilders. Captain Willmott and· Chief Engineer Abbott had both spent several months in Norfolk while the Morro Castle was being built, checking her specifications, watching her construction, and testing her machinery and equipment, so it does not seem that her owners are to be condemned because their managing officer did not himself inform Willmott and Abbott as to the capacity of the fire pumps, which, after all, seem to have fully met the required standards.

The Morro Castle was a comparatively new vessel, built in 1930. She had the most modern and approved equipment, and passed satisfactorily the inspections conducted frequently by the various departments of the Government, the last one about a month before the fire.

The cause of the fire has never been discovered. There is no suggestion in the record that Cabaud or libelant were in any way responsible for it. The losses

were not so much due to the small fire which was discovered at 2:10, but to the failure of the Morro Castle's officers and crew to make prompt and sufficient use of the facilities which the ship provided for extinguishing the fire and protecting the passengers and ship; to the delay of some forty-five minutes in reporting it to the bridge; and to the violations of the safety statutes and regulations by the officers in charge of her which, according to the testimony, libelant's managing officers did not participate in and were not privy to.

█ The libelant cannot fairly be held to have failed to use due care in the selection of the master and officers of the Morro Castle. They were men of many years' experience and long in the service of the libelant, and their records and qualifications would seem to have indicated that they were competent to be placed in charge of the Morro Castle. There is no proof that the libelant was negligent in the selection of the crew.

Respondent cites The Virginia, Hines v. Butler, D.C., 264 F. 986, affirmed 4 Cir., 278 F. 877, certiorari denied 257 U.S. 659, 42 S.Ct. 185, 66 L.Ed. 421, in support of its contention that libelant was guilty of neglect for failing to see that the officers and crew observed the statutes and regulations where violations had extended over a period. However, there are important differences between The Virginia and the case at bar. The Virginia was a bay steamer operated like a "ferry line" between Baltimore and Norfolk and was in Baltimore every other day and her drills were held only in port where the Federal Manager and the superintending engineer of the line were aboard two or three times a week. Consequently the court found they must have observed the situation, and the court said "It was not the case of a sailing vessel or ocean steamship, which leaves for a voyage of more or less duration, and as to which the owner cannot do more than see, at the time it leaves the wharf for its voyage of uncertain duration, that it is staunch, seaworthy, and properly equipped. * * * it (The Virginia) was practically in a place where it could be daily under inspection of the owner". 278 F. page 880.

Moreover, Judge Rose in the District Court (264 F. 986), 995, whose decision was affirmed, found that the statutes and regulations had been violated in several respects, and particularly criticised the fact that although a sprinkler system had been installed as required under the then existing official regulations, it was not, as called for under the regulations, in condition so as to be easily and quickly accessible of operation for "cargo was habitually stored under the valves, so that nobody could get to them" and he found that for all practical purposes this made the system useless; also that no one on board was familiar with the sprinkler system or how it worked.

█ Libelant urges that pursuant to the terms of respondent's insurance policy which required that libelant "take such steps to protect his (and/or the assurer's) interest as would reasonably be taken in the absence of this or a similar insurance" it made a reasonable settlement of these claims which the respondent did not, when consulted, object to. Libelant's contention is that libelant became liable under Title 46 U.S.C. § 491, 46 U.S.C.A. § 491, R.S. § 4493, for the full amount of damage sustained by the passengers for death, personal injuries and loss of baggage irrespective of any question of statutory privity because of the specific negligence of the officers of the Morro Castle and the master's clear violations of the statutes and regulations which included, the failure to report the fire to the bridge until about forty-five minutes after it had been discovered; the failure to promptly send out radio distress signals; the violations of the statutes and regulations in respect to the fire hydrants and fire hose; the fire extinguishers; fire and boat drills, and watchmen. And libelant says it would have had the burden of proving that none of the violations could have caused or contributed to the loss, which burden it would have been impossible to sustain. That libelant would have that burden is not open to question. The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148; The Madison, 2 Cir., 250 F. 850.

In Hines v. Butler, 4 Cir., 278 F. 877, certiorari denied 257 U.S. 659, 42 S.Ct. 185, 66 L.Ed. 421, it was held that although the owner of the vessel which was destroyed by fire could limit liability for cargo claims when it was not guilty of privity, it could not, because of R.S. § 4493, Title 46 U.S. C. § 491, 46 U.S.C.A. § 491, limit its liability as to passengers, and the owner was liable in full for passenger claims for death, injuries, and loss of baggage. See also The Annie Faxon, 9 Cir., 75 F. 312; In re Pacific Mail Steamship Co., 9 Cir.,

264

130 F. 76, 69 L.R.A. 71; Long Island North Shore Passenger & Freight Transp. Co., D.C., 5 F. 599; The Garden City, D.C., 26 F. 766; Carroll v. Staten Island R. R. Co., 58 N.Y. 126, 17 Am.Rep. 221.

The decision in the Princess Sophia, 9 Cir., 61 F.2d 339, certiorari denied Brace v. Canadian Pacific R. Co., 288 U.S. 604, 53 S.Ct. 396, 77 L.Ed. 980 is to the contrary, but that court seems to have regarded Butler v. Boston & Savannah S. S. Co., 130 U.S. 527, 9 S.Ct. 612, 32 L.Ed. 1017 as having held or strongly intimated that liability imposed by Section 4493 was subject to limitation like any other claim. It seems to me that Butler v. Boston & Savannah S. S. Co. did not dispose of the question but left it open.

 I think that it is fairly clear that the purpose of Section 4493 of the Revised Statutes passed in 1852 must have intended to provide that such damage as came within Section 4493 was not to be subject to diminution under the Limitation Statute enacted in the previous year. The object of § 4493 undoubtedly was to provide additional safeguards on vessels carrying passengers and to compel as near as possible the observance of safety laws and regulations. It seems to me that it was the clear intention of Congress to provide that if an owner violates these rules and regulations, it may not avail itself of the full benefits of the Limitation Statute but becomes liable to passengers under § 4493, and that this section was intended as a supplement to § 4283, 46 U.S.C.A. § 183. The effect of § 4493 is to add a further condition upon which limitation may be granted.

 Accordingly, I find that libelant was liable for the damages sustained by the passengers for death, injury and loss of baggage; also that as the losses did not arise from the act or neglect of libelant or its managing officers, and as libelant or its managing officers were not privy to any act or neglect causing the losses, they are recoverable from respondent under the terms of its policy.

On July 1, 1935, the New York and Cuba Mail Steamship Company, the libelant herein, Henry E. Cabaud, its Vice-President and Managing Officer, William F. Warms and Evan S. Abbott were found guilty by a jury in the United States District Court for this District of violation of Title 18 U.S.C. § 461, 18 U.S.C.A. § 461, which reads: *"Loss of life by misconduct of offi-*

*cers of vessels; liability of corporation officer.* Every captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, and every owner, charterer, inspector, or other public officer, through whose fraud, neglect, connivance, misconduct, or violation of law the life of any person is destroyed, shall be fined not more than $10,000, or imprisoned not more than ten years, or both. When the owner or charterer of any steamboat or vessel shall be a corporation, any executive officer of such corporation, for the time being actually charged with the control and management of the operation, equipment, or navigation of such steamboat or vessel, who has knowingly and willfully caused or allowed such fraud, neglect, connivance, misconduct, or violation of law, by which the life of any person is destroyed, shall be fined not more than $10,000, or imprisoned not more than ten years, or both. (R.S. § 5344; Mar. 3, 1905, c. 1454, § 5, 33 Stat. 1025; Mar. 4, 1909, c. 321, § 282, 35 Stat. 1144.)"

The New York and Cuba Mail Steamship Company was sentenced to pay a fine of $10,000; Cabaud was sentenced to pay a fine of $5,000 and to serve a year in jail, the sentence of a year in jail being suspended. All four defendants appealed, but later the New York and Cuba Mail Steamship Company and Cabaud withdrew their appeals and paid their fines. The appeals of Warms and Abbott were prosecuted and their convictions were reversed. United States v. Abbott, 2 Cir., 89 F.2d 166, 1937 A.M.C. 533.

 The record of the conviction of the New York and Cuba Mail Steamship Company and its managing officer, Cabaud, is offered in evidence by the respondent as a bar to the present proceeding. Libelant urges that the conviction of the libelant company is not relevant or material on any issue between libelant and respondent and is not admissible in evidence in this suit; that the conviction of Cabaud is not admissible for like reasons, and further wholly collateral because he is neither a party to this suit or to the insurance policy. Primarily, the admissibility of the criminal conviction of Cabaud and the libelant company should depend upon the probative value of that judgment. Undoubtedly there is or was a rule under which a judgment in a criminal case gen-

erally will be excluded from consideration in a civil case, even though it can be said that the facts upon which the criminal conviction was founded are again at issue in the civil case. Chantangco v. Abaroa, 218 U.S. 476, 481, 31 S.Ct. 34, 54 L.Ed. 1116. (This was a case of acquittal and not conviction.) Even if the old rule is not followed, the differences between the usual criminal proceeding and a civil action still make it impossible to apply the doctrine of res adjudicata if a criminal conviction is introduced into evidence in the civil action, as the parties are not the same. See Burt v. Union Central Life Insurance Company, 187 U.S. 362, 367, 23 S.Ct. 139, 47 L.Ed. 216.

■ The doctrine of mutual estoppel does not apply for the parties are not the same and this doctrine requires that no party to a legal proceeding should be bound by a prior judgment unless the party seeking the benefit of the former adjudication would have been prejudiced by it if it had been determined the other way, and clearly the acquittal of the libelant company in the criminal proceeding would not have prejudiced the respondent respecting its effort to establish its privity defense under the policy, nor would it have determined any of the issues as to respondent's liability.

In Eagle Star & British Dominions Ins. Co. v. Max Heller, 149 Va. 82, 140 S.E. 314, 57 A.L.R. 490, it was held that conviction of insured for wilfully burning his property to obtain insurance was a bar to recovery on insurance policy and to bind insured, notwithstanding the general rule that a record of conviction is not binding as to facts subsequently in issue in civil action. However, in Rhines v. Bond, 159 Va. 279, 165 S.E. 515, 517, the same court declined to follow this rule and said "Under the facts of that case [Eagle Star & British Dominions Ins. Co. v. Heller], the court made an exception to the general rule upon grounds of public policy; but we think that the exception there made should not be extended to apply to cases such as the case at bar". The decision in the Eagle Star case may be distinguished for the reason that it represents an application of a principle of public policy with respect to the enforcement of insurance policies in an instance where the very enforcement amounts to a reimbursement for the deliberate commission of a crime.

■ A judgment of conviction is conclusive of the fact of the conviction when, in a civil action, the issue relates to the fact of the judgment and not to the existence of the facts upon which he was convicted. See Burt v. Union Central Life Insurance Company, supra. A defendant's conviction stands, but he is not foreclosed from presenting those facts with or without additional evidence in a civil proceeding for determination in that proceeding. The verdict in the criminal case does not attest the facts on which the jury may have rested their verdict. They did not observe the facts themselves. Their verdict represented only their conclusion or opinion from what others testified to. However, since many of the early substantial distinctions between civil and criminal trials have been done away with, the trend of the courts is to treat a criminal conviction as having some probative value and to relax the rule of complete exclusion of a judgment of conviction and to receive it as prima facie evidence of the facts involved. This is the rule in New York. Schindler v. Royal Insurance Company, 258 N.Y. 310, 179 N.E. 711, 80 A.L.R. 1142, which has been applied in the following cases: The Rose Murphy, Fidelity-Phoenix Fire Ins. Co. v. Murphy, 226 Ala. 226, 146 So. 387, 1933 A.M.C. 444, Alabama Supreme Court; Sovereign Camp W. O. W. v. Gunn, 224 Ala. 444, 140 So. 410; North River Insurance Co. of City of New York v. Militello, 100 Colo. 343, 67 P.2d 625; North River Insurance Co. of City of New York v. Militello, 104 Colo. 28, 88 P.2d 567, Supreme Court of Colorado; See also In re Crippen, L.R.1911 (Probate) 108 L.J. (Probate) N.S., 47; Mash v. Darley, [1914] 1 K.B. 1.

■ I shall adopt the rule of Schindler v. Royal Insurance Company, supra, at least in the present instance and receive in evidence the judgment of the conviction as prima facie evidence of the facts involved. But where a presumption or inference is permissible it yields to proof to the contrary. New York Life Insurance Co. v. Gamer, Executrix, 303 U.S. 161, 58 S.Ct. 500, 82 L.Ed. 726, 114 A.L.R. 1218; American Alliance Ins. Co. v. Brady Transfer & Storage Co., 8 Cir., 101 F.2d 144.

After a full examination of the entire record, weighing all the evidence and giving due weight to the verdict in the criminal case as prima facie evidence of the

facts, I find that the loss did not result from the neglect of libelant or its managing officers; also that neither libelant nor its managing officers were privy to any act or neglect causing the loss.

It is my opinion that libelant was liable for the damage sustained by the passengers for death, personal injuries and loss of baggage, and that the loss which libelant sustained in satisfying claims for those damages was not within the excepting provisions of the policy. The cause of the loss was the negligence of the officers and crew of the Morro Castle; and I think respondent's "Protection and Indemnity" policy was intended to protect and indemnify the owner against just such a loss.

Accordingly the libelant may have a decree with the usual reference to a Commissioner as to damages, unless agreed upon.