## NEW YORK & CUBA MAIL S. S. CO. v. CONTINENTAL INS. CO. OF CITY OF NEW YORK.

### No. 116.

Circuit Court of Appeals, Second Circuit.

Jan. 27, 1941.

and Eugene Underwood, all of New York City, on the brief), for libellant-appellee.

Cletus Keating, of New York City (Kirlin, Campbell, Hickox, Keating & McGrann, Tompkins, Boal & Tompkins, Arthur M. Boal, and James H. Herbert, all of New York City, on the brief), for respondent-appellant.

CLARK, Circuit Judge.

Early in the morning of September 8, 1934, libellant's chartered steamship Morro Castle, en route from Havana to New York, was destroyed by fire under circumstances at once poignant and dramatic. She was then under command of her Chief Officer Warms, who had only assumed this responsibility when her captain, Willmott, died of heart failure at 7:45 the previous evening. About 2:10 A.M., a passenger discovered a small fire in a closet in the writing room. He immediately reported it to a steward. Several other passengers knew of the fire. What, if any, actions were then taken to combat it does not appear; for some unexplained reason it was not reported to the acting captain until 3 A.M., by which time it had become so great as to be visible to another ship three to four miles away. No radio distress signal was sent out until 3:15, and then only a stand-by signal. Not until thirteen minutes later was there an S.O.S. sent out, although several vessels were in the vicinity. The crew launched six lifeboats having a capacity of 408 passengers, but only 10 passengers, together with 87 of the crew, escaped in them. Others were rescued by lifeboats from other vessels which came to the rescue. The result of the disaster was that 89 of the 316 passengers and 34 of the 231 members of the crew were dead or missing, and the Morro Castle was a total wreck.

Thereafter an indictment was returned in the district court under 18 U.S.C.A. § 461 against libellant and Henry E. Cabaud, its managing officer, together with Warms and Abbott, the chief engineer of the ship. Under this statute "every captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, * * * shall be fined not more than

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

Roscoe H. Hupper, of New York City (Burlingham, Veeder, Clark & Hupper, Chauncey I. Clark, Ray Rood Allen,

$10,000, or imprisoned not more than ten years, or both." Like penalties are then provided for owners and charterers, and for their executives, though on a somewhat different basis of fault, viz., owners and charterers "through whose fraud, neglect, connivance, misconduct, or violation of law the life of any person is destroyed"; and any executive officer of a corporate owner or charterer, charged with control of the operation of the vessel, "who has knowingly and willfully caused or allowed such fraud, neglect, connivance, misconduct, or violation of law, by which the life of any person is destroyed." After a lengthy trial the jury found all the defendants guilty, and judgments of conviction were entered. Libellant was sentenced to pay a fine of $10,000, while Cabaud was sentenced to pay a fine of $5,000 and to serve a year in jail, the jail sentence being suspended. All appealed; eventually libellant and Cabaud withdrew their appeals and paid their fines. The convictions of Warms and Abbott were reversed by this court, United States v. Abbott, 2 Cir., 89 F.2d 166, in substance because, so far as statutory violations affecting the ship's officers were concerned, they involved Willmott, the dead master, and not the accused, his mere subordinates.

This proceeding is a libel brought by the ship's charterer to recover, under a protection and indemnity insurance policy issued by respondent on the vessel, for the losses which it has been forced to pay as a result of the disaster. Libellant, being faced with many claims for damages for loss of life and injury to person and property, started proceedings for limitation of liability, which, when contested, it eventually settled for the sum of $890,000. Although respondent was notified, it refused to participate in or advise as to the settlement. The decree from which this appeal is taken referred the cause to a master to ascertain damages to the libellant. The court concluded that, in view of the several violations of statutes and regulations, libellant could not secure limitation of liability as to passengers, because 46 U.S.C.A. § 491 limits to that extent 46 U.S.C.A. §§ 183, 189—a conclusion which respondent, while denying all liability, challenges as its alternative ground of appeal. The court held, however, that no recovery could be had for cargo claims, since libellant was not liable therefor, and only partial recovery for the claims of the crew, since liability for those might have been limited under the statute. By cross-appeal libellant raises the question whether it should not recover in full for all losses paid by it.

The substantial issue on this appeal is whether or not the loss of the Morro Castle was due to the actual fault or privity of the libellant, and thus outside the coverage of the policy according to its terms. The important contracting clause of the policy, appearing immediately upon its face, reads as follows: "The Assurers hereby undertake to make good to the Assured or the Assured's executors, administrators and/or successors, all such loss and/or damage and/or expenses as the Assured, without their actual fault or privity, shall have become liable to pay and shall pay as shipowners or as having an interest in the vessel named herein on account of the liabilities, risks, events, happenings and/or occurrences herein set forth." Thereupon are set forth some fourteen forms of losses covered, including liability for loss of life of, or personal injury to, persons not employees of the assured or seamen.

Later on we find a similar restriction, repeated in small type in the inside of the policy as one of a great number of "General Conditions and/or Limitations," as follows: "The Assurers shall not be liable to the Assured for any loss, damage, or expense to which the Assured, or the managing officers of his organization are privy, or which arises from his or their act or neglect." The word "managing" appeared as a typewritten insert in the printed clause.

Libellant admitted that the officers and crew of the ship were guilty of various infractions of the Safety at Sea Statutes and regulations, but claimed that these occurred without any actual fault or privity on its part. Respondent's main defense was that such actual fault or privity was shown. Supporting its main defense it also claimed that the burden of proof was on the libellant throughout and thus required the latter to show absence of privity, that the conviction of libellant and Cabaud in the criminal case showed such privity, and that the violations of law by the officers

and crew had long been either known to, or carelessly overlooked by, Cabaud and the marine superintendent, Thomas Torresson, both of whom were managing officers of libellant's organization within the policy provision. The court held substantially with the respondent on the supporting defenses, though it admitted the conviction as prima facie evidence only, yielding to contrary proof.[1] And on all the evidence it concluded that the statutory violations and other defaults of the master and crew were unknown to libellant, and that the disaster occurred without libellant's actual fault or privity. D.C.S.D.N.Y., 32 F. Supp. 251.

There seem to be no explicit decisions to guide us as to the meaning of the crucial words in the policy. The words "without his actual fault or privity" occur in the British limitation statute, Merchant Shipping Act, 1894, § 502. In Asiatic Petroleum Co., Ltd. v. Lennard's Carrying Co., Ltd., 1914, 1 K.B. 419, 432, affirmed, 1915, A.C. 705, it was held that this phrase conveyed the idea of something blameworthy to the owner, but it included also acts of omission, as well as commission, even where the owner himself was not the sole or next or chief cause of the loss. There limitation was denied shipowners where the managing director of the company, which, in turn, owned the shipowners, knew that the vessel's boilers were defective, but took no action and loss by fire eventually resulted. Likewise the language is substantially similar to our Limitation of Liability Statute, 46 U. S.C.A. § 183, allowing limitation to the owner's interest in the ship and her freight only for losses incurred "without the privity or knowledge of such owner or owners." Though the analogy between a statutory provision for limited liability and a contract by a paid insurer to relieve its promisee of loss should not be pressed too far, the close similarity of language and the absence of other analogies suggest the applicability of precedents under the statute on the only important point of dispute here as to the interpretation of the policy, namely, whether libellant's fault or privity extends to acts or omissions of Torresson or is limited to those of Cabaud alone.

▮ The position of Torresson, libellant's marine superintendent, is important because Cabaud's defense was that he had intrusted actual superintendence of the ship and its equipment as it sailed each week to Torresson. Torresson, who had offices on the dock, testified that his duties were to superintend the maintenance of the ship and its equipment, and to see that the laws and regulations with respect to the seaworthiness, fire protection, and safety of passengers and crew were obeyed. Libellant claims that his duties did not bring him within the language in question, which, it asserts, extended only to the executive officers of the company, chosen by the directors to carry out their policies. Libellant also refers to certain changes made in the insurance contract as supporting this view, though we do not see how these vary the contract materially.[2] We think that libellant's reading of the phrase is too limited. It destroys all force to the restriction in a situation such as is here disclosed. High executives of a large steamship line will hardly charge themselves with the superintendence of details as to each of their vessels; that is a proper function of some responsible under official. A marine superintendent who visits the vessel each time it docks, and who is the only shore official having immediate contact with the particular vessel and its officers, would seem to be the direct representative of the owner so far as safety regulations are concerned. At any rate, he is the only one; if not he, then no one has such functions. Under the limitation statutes it is clear that the company would be held in privity with him.

---

[1] For reasons stated in the Addendum to this opinion, respondent's claim of error on this point is not considered herein.

[2] The word "actual" first appeared before the word "fault" in the 1933-34 policy, the one before the policy in suit; it was again omitted in 1936 and thereafter. The word "managing," appearing before "officers" in the condition clause, had so appeared as a typewritten insertion since 1931; in 1935, after the fire here, the words "or managing agent" were added after the words "a managing officer" in the condition clause. Apparently these changes show only repeated attempts to find a formula applicable to a situation such as Torresson's.

See Spencer Kellogg & Sons v. Hicks, 285 U.S. 502, 511, 52 S.Ct. 450, 76 L.Ed. 903 (works manager of the company's Edgewater plant); The Erie Lighter 108, D.C.N.J., 250 F. 490 (superintendent of the shipowner's marine department); In re Jeremiah Smith & Sons, Inc., 2 Cir., 193 F. 395 (manager of the line at Fall River); The New York Marine No. 10, 2 Cir., 109 F.2d 564 (Buffalo agent of the line). In each case we have a company officer who actually managed or directed a portion of its affairs; we do not think the precedents can be rendered inapplicable here by considering these persons as mere agents, or believe the contracting parties had in mind some subtle gradation of managerial officers. Compare the Lennard's case, supra, when in the House of Lords, 1915, A.C. 705; In re New York Dock Co., 2 Cir., 61 F.2d 777;[3] and see also The Fanny D, 5 Cir., 112 F.2d 347, 350.

■ We also agree with the court below that the burden of proof remained with the libellant throughout. The restriction here appears as a direct limitation of respondent's promise in its chief enacting clause. It is more than a mere defense, and inheres in the type of policy itself, which, as stated on its face, is a policy of "protection and indemnity." It was therefore the duty of the libellant to show that the losses claimed were within the terms of respondent's promise and happened without its actual fault or privity. Richelieu & Ontario Navigation Co. v. Boston Marine Ins. Co., 136 U.S. 408, 421, 422, 10 S.Ct. 934, 34 L.Ed. 398; Sohier v. Norwich Fire Ins. Co., 11 Allen, Mass., 336; Carles v. Travelers' Ins. Co., 238 App.Div. 43, 263 N.Y.S. 29; Ferguson v. Cappeau, 6 Har. & J., Md., 394, 401.

The situation is naturally otherwise, where the risk is apparently within the policy, except for violation of some condition, which is a matter of defense. Cf. Western Assur. Co. of Toronto v. J. H. Mohlman Co., 2 Cir., 83 F. 811, 40 L.R.A. 561, certiorari denied, 168 U.S. 710, 18 S.Ct. 949, 42 L.Ed. 1213; Freeman v. Insurance Co., 144 Mass. 572, 12 N.E. 372; Murray v. New York Life Ins. Co., 85 N.Y. 236. Libellant asserts that after a long and full trial the matter of burden of proof became insignificant. But at the end of the case the problem still remained as to the responsibility of Cabaud and Torresson for what was habitual practice on the ship. Libellant, for natural reasons, called as few witnesses as possible and none of the ship's officers or crew except one steward, the carpenter, the purser, and the head waiter. And notwithstanding its ruling, the court below seems to have given Cabaud and Torresson the benefit of any doubt by saying that any inference that they knew their instructions were being violated was "not sufficiently strong to justify a definite finding to that effect." We think it important, therefore, to recall that libellant could not rely on absence of evidence against these officers, but was required affirmatively to show that the loss was not caused by their act or neglect.

■ We do not think that libellant sustained that burden. On all evidence we think there was such actual fault or privity of libellant in the violation of safety statutes as to take the loss outside the scope of the policy. Generally these violations consisted of a failure in several respects to provide a proper watch, and the failure to prepare men and equipment for the emergency of a

---

[3] Cases are collected in 35 Col.L.Rev. 255; Sprague, 12 N.Y.U.L.Q.Rev. 568, 597; Springer, 11 St. John's L.Rev. 14, 27; Robinson on Admiralty, 946-950. In consequence of this disaster, the Limitation Statute, 46 U.S.C.A. § 183, was amended in 1935 to provide, inter alia, that the [actual] privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, should be deemed conclusively the privity or knowledge of the vessel owner where there was loss of life or bodily injury; in 1936, the bracketed word was elided. 49 Stat. 960, 1479. Compare Springer, op. cit. at 32, that the doctrine of the owner's imputed knowledge would probably be more liberally applied thereafter, and Purdy, 5 Brooklyn L.Rev. 42, 58, that, in the light of prior decisions, this amendment was a change of law as to the master only. See also 10 Tulane L. Rev. 119. For argument that this legislation applied to pending claims and acts, see Walburg, 4 U. of Newark L. Rev. 166; but compare The Fred Smartley, Jr., 4 Cir., 108 F.2d 603, certiorari denied, Loveland, Inc. v. Pennsylvania Sugar Co., 309 U.S. 683, 60 S. Ct. 724, 84 L.Ed. 1027; The Pocahontas, D.C.N.J., 20 F.Supp. 1004.

fire and of abandonment of the vessel. Both contributed directly to the loss—the first by the long delay in combating the fire, the second by the inadequate use of the lifeboats.

■ 46 U.S.C.A. § 673 requires the division of the sailors at sea into equal watches. This means "successive and continuous watches to be constituted in numbers as nearly equal as the sum of the whole number would permit." O'Hara v. Luckenbach S. S. Co., 269 U.S. 364, 46 S.Ct. 157, 159, 70 L.Ed. 313; Southern Pac. Co. v. Hair, 5 Cir., 24 F.2d 94. Limitation of liability was denied for failure to maintain equal watches in The Denali, 9 Cir., 105 F.2d 413, Id., 9 Cir., 112 F.2d 952, even against the finding of the district court that that default was not the cause of the loss. 29 Calif. L.Rev. 56. True, this court had allowed limitation earlier in American-Hawaiian S. S. Co. v. Pacific S. S. Co., 9 Cir., 41 F.2d 718, certiorari denied, 282 U.S. 874, 51 S.Ct. 79, 75 L.Ed. 772, though there the default was not brought home to the owners.

Here libellant concedes, as the district court has found, that the statute was violated for a long period before and up to the time of the fire. Of twenty-five sailors available, at least fourteen were customarily assigned to day duty cleaning and painting the ship, and usually only nine were assigned to watches, that is, only three, instead of the required eight or nine, were on watch duty at any given time, including the time of the fire. Libellant claims, however, that this was done under Captain Willmott's orders, in violation of Torresson's instructions, and unknown to any of the managing officers of the company.

Torresson and Cabaud both admit that they knew of the provisions of the statute requiring division of the crew into equal watches. Indeed, in 1926, after the O'Hara decision, the U. S. local inspectors wrote libellant to this effect, and further correspondence then had with Torresson made the requirement quite explicit. Cabaud claims only that he instructed his marine department to "check up with the masters." Torresson, however, at least twice sent written instructions to the masters of the company's ships that they should strictly obey this particular statute—the first on December 14, 1926, and the second in September, 1930, when he further directed that there be entered in the ships' logbooks the names of all officers and members of the crew standing each watch. The entries in the Morro Castle's logbook disclosed how regularly his instructions were violated; the usual three-man watch is clearly and unequivocally shown. Yet Torresson says that he not only failed to make any personal investigation, but also never noticed these entries, neither when he boarded the vessel weekly, nor when the books were permanently stored in his office. This singular blindness becomes more puzzling in the light of the fact that the use of the fourteen seamen on daytime maintenance work instead of night watches was a matter of economy entirely within the domain of Torresson's avowed responsibilities.

■ If it is true that Torresson never actually became aware of this violation, we think that such failure under the circumstances was itself gross neglect of his duties, the toleration of which would be highly inimical to the safety of persons at sea. A similar view was taken in the case of Asiatic Petroleum Co., Ltd. v. Lennard's Carrying Co., Ltd., supra, 1914, 1 K.B. at 432, 434, 439, 440, where the court held damage to a vessel attributable to the fault or privity of a managing officer because he had neglected to examine or have examined at the end of previous voyages logbook entries which disclosed the defective condition of the engines and boilers, the direct cause of the loss. And the authorities under our own statute, though they excuse mere negligence, do hold the owners for what they "could have seen if they had looked" over a considerable period of time, as Judge Hough well puts it in The Argent, 1940, A.M.C. 508, decided in 1915. The Republic, 2 Cir., 61 F. 109, 113; In re P. Sanford Ross, Inc., 2 Cir., 204 F. 248; The Maria, 4 Cir., 91 F.2d 819; In re Great Lakes Transit Corp., 6 Cir., 81 F.2d 441; Christopher v. Grueby, 1 Cir., 40 F.2d 8, certiorari denied, 282 U.S. 876, 51 S.Ct. 80, 75 L.Ed. 774; The Miami, D.C.E.D.N.Y., 43 F.2d 562; cf. In re Jacobson, D.C.S.D.Tex., 52 F.2d 179.

The words of the policy here go somewhat beyond the Limitation Statute, in that they expressly except liability for loss which arises only from the neglect of the assured or the managing officers of its organization. Torresson's neglect here was a neglect of the libellant which is inexcusable where dangers at sea are involved and which excludes liability upon the policy.

Other rules specifying the watch to be kept were unquestionably violated. Every steamer carrying passengers at night shall, under 46 U.S.C.A. § 470, "keep a suitable number of watchmen in the cabins, and on each deck, to guard against fire or other dangers, and to give alarm in case of accident or disaster." The Regulations of the Board of Supervising Inspectors—Ocean & Coastwise—Rule V, subd. 25, require steamers to have "a lookout at all times at or near the bow and one watchman in each cabin and steerage," all watchmen to be under the direct charge of the master or officer in command of the vessel, and each to report to the officer in command at the pilot house at fixed intervals of not longer than every hour. On the Morro Castle three were signed as deck watchmen and four as cabin watchmen, but all were under the second steward, instead of the captain, and none reported to the bridge. The deck watchmen were put on cleaning and repair work, and three of the cabin watchmen really served as stewards waiting on passengers, never doing any patrolling. Here again the court found Willmott responsible, and exonerated Torresson as ignorant of everything; but again, we do not believe that libellant sustained its burden of showing its freedom from fault.

■ Respondent also charges, and the court found, that proper fire and boat drills were not held, and it is evident that there are not the proper detailed logbook records of whatever drills occurred. See 46 U.S.C.A. § 481, and Rule·V, subd. 18, of the Board of Supervising Inspectors. The president of libellant, a Mr. Mooney, saw one drill, but was not called. Cabaud saw an admittedly incomplete one while at sea, but says Captain Willmott explained that the boats were damaged. And again, Torresson disclaims learning anything from the logbooks, even that there were not complete records of drills. We think this affirmatively indicates fault and privity; certainly libellant did not show freedom from fault.

Finally, there were charges sustained of the improper maintenance of fire-fighting equipment and failure to exercise the crew in handling oars. That this was not the fault of managing officers is highly doubtful; nevertheless we are not prepared to say that the finding of the district court on this issue should not stand.

All these offenses were serious, flagrant, and long-continued. It is almost past belief that they could have escaped the notice of the managing officers of the company; and if they did, it was only because Torresson, or whoever in the company did have managerial duties, disregarded or evaded them. Respondent did not bargain to be, and is not, liable for losses arising from the resulting disaster.

Thus far we have emphasized the responsibility of Torresson. We think something should be said separately about Cabaud. Cabaud admitted that he was the vice president of the company and in general charge of the administration of the business, that he went on board the Morro Castle as she called weekly in New York, getting an impression of general conditions there, and that he had taken four trips on the Morro Castle from New York to Havana and return in 1930, 1931, 1932, and the spring of 1934. Respondent claimed that from these visits and trips he had personal knowledge of conditions on the vessel and the violation of the statutes and regulations in question. This Cabaud denied; he stood on his·general contention that he had delegated matters to subordinates. The court below found with him on this point.

■ We think a broader issue is presented than merely one of Cabaud's actual knowledge of these conditions. It is whether the operating executive of a steamship company can disclaim actual fault or privity for his company for long-continued violations of safety regulations by delegating all such matters to a subordinate, and thereafter taking no steps whatsoever to see that his subordinate acts. Thus, for eight years, the matter of division of the crew into watches had been known to be considered important by the government authorities; for four years the ship's logs, equally open to Cabaud as to Torresson, show consistent violations. We think that failure to exercise that supervision over his subordinates which some one in authority for the company should have shown is neglect upon the part of the company.

In view of this conclusion, we need not consider the respective claims of the parties as to the extent of recovery, if had, and as to the interrelation of 46 U.S.C.A. §§ 183 and 491.

Reversed; decree directed for the respondent.

Addendum. The court was not in accord as to the force or effect to be given herein to the judgment against libellant and Cabaud in the criminal prosecution, and accordingly decision was reached without determination of that matter. In view of its interest and general importance, I deem it appropriate to state the problem, as well as my own conclusions with respect to it.

Libellant's claim was that the judgment is not relevant to the issues herein and was not admissible for any purpose which developed below. Respondent offered it as complete proof of the fact in issue, pointing out that under the statute, 18 U.S.C.A. § 461, supra, and the indictment and charge of the court, the verdict was more than a finding of negligence; as against the managing officer, Cabaud, in particular, whose conduct is directly in issue, it was a finding that he knowingly and willfully caused or allowed the neglect, misconduct, or violation of law by which lives were destroyed. Respondent cited Eagle, Star & British Dominions Ins. Co. v. Heller, 149 Va. 82, 140 S.E. 314, 57 A.L.R. 490, where a conviction of an insured for willfully burning his property to recover insurance was held a bar to recovery on the policy.

The court, however, did not adopt either of these positions; but relying on Schindler v. Royal Ins. Co., 258 N.Y. 310, 179 N.E. 711, 80 A.L.R. 1142,[4] it received the judgment of the conviction as prima facie evidence of the facts involved. It added, however (32 F.Supp. at 265), "But where a presumption or inference is permissible it yields to proof to the contrary." Respondent asserts that the court, even on the rule adopted, succeeded in insulating the judgment from any effect—so much so, that one commentator speaks of the court's "blunt disparagement of the previous verdict by appearing to ignore it." 50 Yale L.J. 499, 500. Respondent urges that at least the judgment should have been taken as affirmative evidence of the company's default.

The cases are now in substantial conflict as to the effect to be given to a conviction of crime in a civil action involving the same circumstance. The older cases generally excluded such evidence;[5] now, however, there is an apparently increasing number of cases holding to the contrary.[6] A like trend is shown in the comments of text writers.[7] My conclusion was that the conviction should have been treated as direct proof of the company's fault. The nature of the verdict required proof of a higher degree there than was needed here, and the full examination there had (the government presented 86 witnesses and the accused 23) made the result perhaps more trustworthy than here, where, as pointed out above, libellant called few witnesses and none of the ship's higher officers. I appreciate the difficulty pointed out by my associates that, since the jury might have found proven only one of the several violations charged, it is not possible to know upon which ground it went. Nevertheless all those charged were relevant to the issue herein, and I do not believe exact knowledge of the jury's reasoning is important.

---

[4] Hubbs, J., dissented on the ground that the Heller case should have been followed. Compare also In re Rechtschaffen's Estate, 278 N.Y. 336, 340, 16 N.E.2d 357 (conviction as a disorderly person and of nonsupport admissible on issue of husband's abandonment of wife and loss of right to administer her estate); Everdyke v. Esley, 258 App.Div. 843, 15 N.Y.S.2d 666 (assault); Same v. Davison, 253 App.Div. 123, 1 N.Y.S.2d 374 (speeding). Were the present case subject to the federal rules, these holdings would govern under Federal Rule 43(a), 28 U.S.C.A. following section 723c.

[5] For recent cases see Silva v. Silva, 297 Mass. 217, 7 N.E.2d 601; Interstate Dry Goods Stores v. Williamson, 91 W. Va. 156, 112 S.E. 301, 31 A.L.R. 258, 261; New York Life Ins. Co. v. Murdaugh, 4 Cir., 94 F.2d 104; cf. United States v. Satuloff Bros., 2 Cir., 79 F.2d 846. Cases are collected in 31 A.L.R. 261, 57 A.L.R. 504, 80 A.L.R. 1145.

[6] See North River Ins. Co. v. Militello, 104 Colo. 28, 88 P.2d 567; Wolff v. Employer's Fire Ins. Co., 282 Ky. 824, 140 S.W.2d 640; Fidelity-Phoenix Fire Ins. Co. v. Murphy, 231 Ala. 680, 166 So. 604; In re Crippen, 1911, P. 108.

[7] For arguments against admissibility, see Hinton, 27 Ill.L.Rev. 195; for criticism of Professor Hinton's views, see 5 Wigmore on Evidence, 3d Ed. 1940, § 1671a, 4 ibid. §§ 1346, 1346a; and see also 50 Yale L.J. 499; 10 Rocky Mt. L.Rev. 282; 17 Corn. L.Q. 493; 80 U. of Pa.L.Rev. 1164; 12 B.U. L.Rev. 548; 6 St. John's L.Rev. 397.

The verdict was a finding that libellant was guilty of a neglect resulting in loss of life at sea, and that this was knowingly and willfully caused or allowed by its executive officer charged with the control of the operation of the vessel. I think it should be so accepted here.

AUGUSTUS N. HAND, Circuit Judge, concurs in separate opinion, in which Judge SWAN also concurs.

AUGUSTUS N. HAND, Circuit Judge (concurring).

I am in agreement with the result as well as with the reasoning of Judge Clark's opinion respecting matters other than the effect to be given to the judgment of conviction in the criminal case.

Whatever may be the justification under some circumstances for giving any weight in a civil action to a judgment rendered against the defendant in a criminal case, such a judgment ought, in my opinion, to have no effect when the issues determined thereby are not necessarily the same as those involved in the action on trial.

The indictment in the criminal case charged the libellant and its managing officer, Cabaud, with the infraction of statutes of the United States resulting in loss of life and both were found guilty. It is, however, impossible to determine whether either was found guilty of the particular faults which are relied on in Judge Clark's opinion as a basis for holding that the libellant has not established absence of "actual fault or privity". The jury may have convicted for violation of one statutory requirement where we have found a violation of another. Yet a violation of the statutory provision for fire drills would not tend to show a violation of the requirement for the division of the crew into equal watches. To give a criminal judgment evidential weight under such circumstances would be going much farther than admitting proof of other like acts of negligence in support of a cause of action founded on particular acts of negligence of the defendant. It more nearly resembles admitting proof that the defendant was generally careless as to unrelated matters.

It may be that Judge Goddard was justified in admitting the judgment since he could hardly know until the trial was over whether all of the statutory violations charged in the indictment would not be established in the admiralty suit. It is quite different to give the judgment any weight when neither the trial judge nor this court could know that the jury found either the company or Cabaud guilty of any of the faults on which we are basing our present decision.

The situation is quite different from one where an issue known to be determined in a criminal action is involved in a civil suit to which the convicted person is a party.