Mary Eleanor **MORNINGSTAR**, Plaintiff,

v.

**INSURANCE COMPANY OF NORTH AMERICA**, Defendant.

No. 65 Civ. 3274.

United States District Court
S. D. New York.

Jan. 15, 1969.

Freedman, Loewenstein & Meyers, New York City, for plaintiff; Charles J. Meyers, New York City, of counsel.

Friend, Kinnan, Post & Friend, New York City, for defendant; Edward T. Post, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff's husband, Thomas Morningstar, President of Morningstar-Paisley, Inc., (Morningstar-Paisley), was killed in an automobile accident in Harrison, New York on June 11, 1964. Plaintiff instituted this action in the State court to recover the death benefit of $100,000 provided in the Group Travel Insurance Policy issued by the defendant to Morningstar-Paisley. Defendant removed the action to this court because of diversity of citizenship (28 U.S.C. § 1332).

Plaintiff is named as the beneficiary of her husband in the Group Travel Insurance Policy, and Mr. Morningstar's death was a "loss resulting directly and independently of all other causes from accidental bodily injuries." Therefore, plaintiff is entitled to recover under the policy if her husband's injuries arose "out of the hazards described in Schedule II," which provides:

"SCHEDULE II DESCRIPTION OF HAZARDS

The hazards against which insurance is granted under this policy are

(subject to the conditions, limitations and exclusions of the Policy):

All those to which the Insured may be exposed during travel and sojourn on the business of the policyholder, provided such travel is to a point or points located away from the premises of permanent assignment. The following shall specifically qualify the above:

(a) Coverage begins at the actual start of an anticipated trip whether it be from the Insured's place of employment, his home, or other location. Coverage terminates upon his return to his home or place of employment, whichever shall first occur;

(b) Commutation travel is excluded from coverage; "

Mr. Morningstar resided at 25 Orchard Lane, Rye, New York, and the offices of Morningstar-Paisley were located at 630 West 51st Street, New York City. It was Mr. Morningstar's custom to travel by automobile from house to office and return.

Immediately before his accident, Morningstar-Paisley was entertaining suppliers of tapioca starch from Thailand and was discussing with General Foods Corporation, (General Foods), having offices at 250 North Street, White Plains, New York, the possibility of supplying tapioca starch to General Foods' plant in

Orange, Massachusetts. On June 10, the day before Mr. Morningstar's accident, a meeting took place in the General Foods' office at White Plains with regard to these negotiations. Mr. Morningstar had expected to attend this meeting but was unable to do so because of other business obligations. At the conclusion of the June 10 meeting, those present from General Foods and Morningstar-Paisley decided to meet again at Morningstar-Paisley's New York office at 10:00 a. m. on June 11 to discuss product quality control, with regard to which information could be provided by Morningstar-Paisley's technical personnel. Mr. Pfister, a buyer for General Foods, was expected to be present at the June 11 meeting.

Mr. Morningstar returned to his home in Rye on the afternoon of June 10 at around 4:30 or 5:00 p. m. Plaintiff accompanied him that evening to his father's house in Greenwich, Connecticut to attend a dinner party given by his father, who was Chairman of the Board of Morningstar-Paisley, in honor of the visiting suppliers from Thailand. Mr. Malkovich, an executive of Morningstar-Paisley, also attended the dinner party. He testified that Mr. Morningstar had inquired of him about the meeting at General Foods and remarked to him that he would take a chance and try to get hold of the General Foods people before the meeting which was scheduled for 10:00 o'clock the next morning.

Mrs. Morningstar, the plaintiff, testified that usually her husband got up at about 8:00 o'clock and left for work between 8:30 and 8:45 a. m., and that when their neighbor, Earl C. Lenz, Vice-President of Morningstar-Paisley, was home, Mr. Morningstar would drive him to the office in his car. On the morning of June 11, Mr. Morningstar awakened her between 7:00 and 7:30 and requested a quick breakfast. She observed Mr. Morningstar make a telephone call and drink his coffee standing by the kitchen sink. Mr. Lenz testified that Mr. Morningstar had called him and asked him to be ready to leave early, as he planned to drive to General Foods at White Plains to see Mr. Pfister and someone else. Mr. Morningstar told Lenz that morning that "I am assuming Pfister will be in his office." According to Mrs. Morningstar, her husband left the house at around 8:00 a. m., and Mr. Lenz testified that he picked him up shortly thereafter. Mr. Morningstar and Lenz proceeded from Lenz's home at 100 Mendota Avenue along Highland Avenue to Purchase Street and made a left turn on Polly Park Road, where the accident occurred. Mr. Lenz testified that this was the route they followed when they drove to town together via the Hutchinson River Parkway, which they would enter at North Street. He testified that North Street was also the street on which General Foods was located in White Plains, the driving time thereto being some five minutes from the Hutchinson River Parkway.

Mr. Pfister testified for the defendant that he had had no communication with Mr. Morningstar and, indeed, had not met him, although he knew who he was because of the business relationship between General Foods and Morningstar-Paisley. Mr. Pfister was involved in the negotiations on behalf of General Foods and was instructed to be present at the June 11 meeting in Morningstar-Paisley's office. He testified that he proceeded to the meeting by car from his house in Ossining without stopping at his office in White Plains.

■ Plaintiff has the burden of establishing that she is covered by the terms of the policy and that no exclusion is applicable. New York & Cuba Mail S. S. Co. v. Continental Insurance Co., 117 F.2d 404 (2d Cir.), cert denied, 313 U.S. 580, 61 S.Ct. 1103, 85 L.Ed. 1537 (1941); Lavine v. Indemnity Insurance Co., 260 N.Y. 399, 183 N.E. 897 (1933); Society of New York Hospital v. Burstein, 22 A.D.2d 768, 253 N.Y.S.2d 753 (1st Dept. 1964); Sagorsky v. Malyon, 4 A.D.2d 1016, 168 N.Y.S.2d 490 (1st Dept. 1957); Carles v. Travelers' Insurance Co., 238 App.Div. 43, 263 N.Y.S. 29 (1st Dept. 1933); Stawski v. John Hancock

Mutual Life Insurance Co., 7 Misc.2d 424, 163 N.Y.S.2d 155 (Sup.Ct.), appeal dismissed, 4 A.D.2d 940, 170 N.Y.S.2d 489 (1st Dept. 1957).

■ The evidence raises a strong unrebutted inference that at the time of his accident on June 11, 1964, Mr. Morningstar was proceeding to the White Plains office of General Foods "on the business of the policyholder," to consult with Pfister and another General Foods representative in connection with the tapioca negotiations. Perhaps he planned to offer Pfister a ride to the New York meeting, as a gesture of business good will. In any event, his purpose was to further his company's business by going to the General Foods offices. His declarations, his unusual haste in leaving home on the morning of the accident, his interest in the pending negotiations, and his position as president of his company all support this conclusion.

His intended travel to White Plains was to "a point * * * located away from the premises of permanent assignment." Mr. Lenz testified that he and Mr. Morningstar customarily drove to New York City either by taking the New England Thruway or the Hutchinson River Parkway. The White Plains office of General Foods was not on either of these two normal routes between home and office and to go there was a substantial deviation from the normal route. It is immaterial that Mr. Morningstar never arrived at White Plains, because coverage began at the start of the anticipated trip (Schedule II, Part (a)).

Part (b) of Schedule II provides that "commutation travel is excluded from coverage," so it remains to be determined whether Mr. Morningstar was engaged in such travel at the time of his accident. Defendant offers the definition of "commutation" in Webster's Third New International Dictionary (Unabridged) to support its argument that Mr. Morningstar was so engaged, which reads:

"act of commuting: travel back and forth between two points, especially between home and work, repeated a certain number of times within a given interval."

■ Mr. Morningstar's commuting travel was between home and office. Here he started off on a trip to White Plains, which was a deviation from his usual commuting travel. His purpose in starting for White Plains was a business one, so that he was not on commuting travel.*

■■ If there is an ambiguity in the use of the term "commutation travel" or if it is susceptible to two interpretations, "it should be most strongly construed against the insurer, because the latter has prepared the contract and is responsible for the language used." Janneck v. Metropolitan Life Insurance Co., 162 N.Y. 574, at 577, 57 N.E. 182, at 182 (1900); Hartol Products Corp. v. Prudential Insurance Co., 290 N.Y. 44, 47 N.E.2d 687 (1943). This is particularly true with respect to exceptions and exclusions in the policy. Sincoff v. Liberty Mutual Fire Insurance Co., 11 N.Y.2d 386, 230 N.Y.S.2d 13, 183 N.E.2d 899 (1962), where the Court of Appeals stated:

"The term, therefore, obviously is capable of more than one meaning. This being so, the doubt in the exclusory clause must be resolved in favor of the insured. The burden was on the defendant in this case to establish that the term 'vermin' not only was susceptible of being defined by the average man so as to include carpet beetles, but that such a definition was the *only* one that could 'fairly be placed thereon' * * *. It was not sufficient for the defendant to demonstrate that a purchaser of the policy

---

* Counsel for defendant stated during the trial that, had Mr. Morningstar stopped at the St. Regis Hotel to pick up the visiting Thai businessmen and take them to the meeting, "I don't think that in fairness I could say that was commuting." although he also insisted that that would be on Mr. Morningstar's commuting route.

involved herein might have construed 'vermin' to include carpet beetles. Defendant, to derive any benefit from the exclusory clause, was obliged to show (1) that it would be unreasonable for the average man reading the policy to conclude that nonparasitic carpet beetles were not vermin and (2) that its own construction was the only one that fairly could be placed on the policy. This the defendant was unable to do." 11 N.Y.2d at 390, 230 N.Y.S.2d at 15, 16, 183 N.E.2d at 901. Defendant here also has failed to sustain its burden of showing that its interpretation of "commutation travel" is the only reasonable one, and that it would be unreasonable for the average man reading the contract to interpret it otherwise. "Commutation travel," therefore, is construed to mean regular travel between home and work for the sole purpose of reaching the intended destination; a deviation for a business purpose, such as a stop to consult with or give a ride to a businessman with whom one is engaged in negotiations, takes the travel out of "commutation travel."

■ Plaintiff has sustained her burden of showing that she is covered by the policy and that the exclusion does not apply, as she has proved by a preponderance of the evidence that the insured was at the time of the accident engaged in travel for business purposes to a point away from the premises of permanent assignment, and was not at the time of the accident engaged in "commutation travel."

■ Defendant has raised as a secondary defense plaintiff's failure to file the required "Proofs of Loss" within the time limit required by the policy, which states:

"Proofs of Loss: Written proof of loss must be furnished to the Company at its said office in case of claim for loss for which this Policy provides any periodic payment contingent upon continuing loss within ninety days after the termination of the period for which the Company is liable and in case of

claim for any other loss within ninety days after the date of such loss. *Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time the proof is otherwise required.*" (Italics supplied.)

Concededly the notice of claim was timely filed, so that MacKay v. Metropolitan Life Insurance Co., 281 N.Y. 42, 22 N.E. 2d 154 (1939); Rushing v. Commercial Casualty Insurance Co., 251 N.Y. 302, 167 N.E. 450 (1929), and Lloyd v. Motor Vehicle Accident Indemnification Corp., 27 A.D.2d 396, 279 N.Y.S.2d 593 (1st Dept. 1967) cited by defendant are not in point, since they involve late filing of notices of claim. Late filing of a notice of claim is not, as defendant contends, "wholly analogous" to late filing of proof of loss, as prejudice is more likely to result to an insurer which has no notice at all of a claim.

Bland v. Trevvett, 23 A.D.2d 534, 256 N.Y.S.2d 644 (4th Dept. 1965), aff'd, 19 N.Y.2d 195, 281 N.Y.S.2d 102, 227 N.E. 2d 896, 897 (1967), cited by defendant is not applicable because the policy there involved did not contain a clause similar to the one underlined above.

■ The evidence revealed that the delay in supplying the proof of loss was occasioned by Mr. Lenz's hospitalization and convalescence, combined with the fact that his attorneys instructed him not to communicate with anyone about the collision. Therefore, he did not supply the itinerary which was a requested part of the proof of loss until December of 1964, some six months after the accident. For this reason, plaintiff's proof of loss could not reasonably have been furnished sooner, and was furnished as soon as reasonably possible. Defendant's counsel conceded at trial that defendant had not been prejudiced by the delay in filing the proof of loss.

Plaintiff is entitled to judgment in the amount of $100,000, plus interest computed from December 16, 1964 (N.Y.Insurance Law, McKinney's Consol.Laws, c. 28, § 166-b).

The foregoing constitutes the court's findings of fact and conclusions of law, F.R.Civ.P. 52(a).