**Julia G. LIGO, Administratrix of the Estate of J. Edwin Ligo, Deceased, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, Defendant.**

**Civ. A. No. 70-1291.**

United States District Court,
W. D. Pennsylvania.

Feb. 17, 1972.

William J. Joyce, of Cusick, Madden, Joyce & McKay, Sharon, Pa., for plaintiff.

David J. Armstrong, of Dickie, Mc-Camey & Chilcote, Pittsburgh, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF COURT

MARSH, Chief Judge.

In this action, the Administratrix of the Estate of J. Edwin Ligo, deceased, seeks to recover $50,000 pursuant to a special hazards group life insurance policy issued to the McDowell National Bank of Sharon, Pennsylvania, by Continental Casualty Company, the defendant. The policy insured the lives of employees and officers of the bank against certain risks and travel while on the business of the bank. After non-jury trial, the court makes the following:

## FINDINGS OF FACT

1. The special hazards group life insurance policy issued by the defendant to the McDowell National Bank of Sharon insured the lives of "ALL ACTIVE, FULL-TIME OFFICERS, MANAGERS, AND OTHER EMPLOYEES OF THE HOLDER [BANK], BETWEEN THE AGES OF 18 AND 69 * * *." Officers and managers were designated in the policy as Class I Insured Persons, and other employees as Class II Insured Persons.

2. The policy was issued on December 22, 1969, and was in full force and effect on June 16, 1970.

3. The sum payable under the policy upon the death of a Class I Insured Person was $50,000, and the sum payable upon the death of other employees was $10,000.

4. J. Edwin Ligo was appointed loan officer by the Board of Directors of the McDowell National Bank of Sharon on December 9, 1969, and continued in that position until his death on June 16, 1970.

5. On June 16, 1970, J. Edwin Ligo was an active, full-time loan officer. His normal working hours were from 9:00 a. m. to 4:30 p. m., Monday through Friday, and from 9:00 a. m. to 12:00 noon on Saturday.

6. On December 9, 1969, there were 23 officers of the bank, including J. Edwin Ligo, and there were the same number on December 22, 1969, the date the policy was issued.

7. The policy was written on a blanket basis with the premium based on 23 officers and managers and 35 other employees.

8. The place of regular work or employment of Ligo at all times material to this action was the main office of the bank in Sharon, Pennsylvania.

9. The policy described the hazards insured against as follows:

"The hazards against which insurance is provided under this policy are, provided such hazards arise while the Insured Person is on the business of the Holder, injuries sustained in consequence of and during the course of any trip made by the Insured Person (excluding everyday travel to and from work and bona fide vacations).

"Such trip shall be deemed to have commenced when the Insured Person leaves his residence or place of regular employment for the purpose of going on such trip, whichever last occurs, and shall continue until such time as he returns to his residence or place of regular employment, whichever first occurs.

" *   *   *

"The term 'on the business of the Holder' as used in this policy, means any trip authorized by or at the direction of the Holder for the purpose of furthering the business of the Holder."

10. At all times material to this action, the main office of the McDowell National Bank of Sharon was located at Chestnut and State Streets in Sharon, Pennsylvania. The bank maintains branch offices at various locations including one in the Borough of Mercer, Pennsylvania, and two in Hickory Town-

ship in Mercer County, one known as the Shenango Valley Mall office and the other known as the Hickory Plaza office.

11. In September or October of 1969, it was important that bank deposit slips, withdrawal slips, mortgage applications, and other bank memoranda at the Shenango Valley Mall Office be delivered daily to the main office of the bank in Sharon, Pennsylvania. It was important that similar bank items be picked up from the Mercer branch bank once or twice a week and from the Hickory Plaza branch office about once a week and delivered to the main bank in Sharon. The messenger service was of importance to the bank since the branch banks had no bookkeeping departments, and it was necessary that deposit slips be delivered to the main office promptly in order that deposits could be credited to customers' accounts.

12. In September or October of 1969, Edward Skriner, Vice President and Cashier of the McDowell National Bank, requested Ligo to stop each morning at the Shenango Valley Mall office, and to stop at the Mercer branch and the Hickory Plaza branch when requested to do so, and pick up the aforesaid bank items and deliver same to the main bank in Sharon before performing his duties as an employee in the mortgage department at the main bank.

13. Skriner expected Ligo to use his own automobile and authorized him to charge the mileage each day from Mercer to Sharon at the rate of 10 cents per mile. Ligo was not to be paid any additional salary or other compensation for this service.

14. Ligo performed the messenger service requested by Skriner from about October of 1969 to June 16, 1970, when he was killed in an automobile accident.

15. In rendering this service, Ligo used a canvas mail bag on which the name "McDowell National Bank of Sharon, Pa." appeared. He took this bag home with him each evening. When he left his residence in the morning on week days for the daily trip on the business of the bank to the branch office or offices, the mail bag was in his automobile.

16. On June 16, 1970, at about 8:30 a. m. o'clock, Ligo was operating his automobile in a westerly direction on Route 62 en route to the Shenango Valley Mall office, when his automobile collided with an oncoming car approximately five miles east of the Shenango Valley Mall office, as a result of which accident the decedent was killed. The mail bag was found in Ligo's wrecked car after the accident.

17. On the date of the accident and for several years prior thereto, Ligo resided with his family on Legislative Route 43099 in East Lackawannock Township in Mercer County about one-half mile northwest of Mercer, Pennsylvania.

18. The Shenango Valley Mall was located at the northeast corner of the intersection of State Route 18 and Route 62 in Hickory Township, Mercer County, Pennsylvania, about 12 miles west of Mercer, Pennsylvania. The bank was located at the southwest corner of the Mall structure.

19. After Ligo began his messenger duties he drove his automobile each morning on Legislative Route 43099 to Route 62 in Mercer and then west on Route 62 to the Mall premises. He used the westernmost entrance into the Mall, this being the most direct route to the Mall. In using this entrance Ligo passed the Route 62 bypass, continued west therefrom on regular Route 62 a distance of about 745 feet to the westernmost entrance to the Mall. He then traveled northwardly from the Route 62 Mall entrance through the Mall premises to the bank parking lot a distance of 617 feet. After leaving the bank about five or ten minutes later, he traveled westwardly 547 feet to an exit on Route 18. He then traveled southwardly on Route 18 a distance of 729 feet to the intersection of Route 18 with regular Route 62. He then continued southwardly about one-quarter mile to the Route 18, Route 62 bypass intersection where he turned

right and traveled in a westerly direction to downtown Sharon. There were traffic signals at the Route 18, Route 62 intersection, and at the Route 18, Route 62 bypass intersection. (See sketch and photograph submitted by counsel.) Traveling to the Mall premises involved a deviation from the shortest direct routes from Mercer to Sharon of about four-tenths of a mile.

20. On days that Ligo intended to stop at the Hickory Plaza branch office in Hickory Township, instead of proceeding southwardly on Route 18 through the intersection of regular Route 62 and Route 18 to the bypass, he would turn right at the regular Route 62, Route 18 intersection and proceed in a westerly direction on Route 62 to the Hickory Plaza. After leaving the Plaza, he would proceed west on Route 62 for a certain distance and then turn left on Buhl Farm Drive leading to the Route 62 bypass which he would then use to travel to downtown Sharon.

21. The route used by Ligo in traveling from his residence to the Shenango Valley Mall office was the most direct route of travel between these points.

22. The route of travel shortest in time from the Ligo residence to downtown Sharon was Legislative Route 43099 into Mercer, Route 62 from Mercer to Route 62 bypass and then Route 62 bypass into Sharon.

23. Some time after Ligo began his messenger duties, Linda Langiotti, an employee at the bank's main office in Sharon, began riding with Ligo from Mercer to the main office each weekday morning except Saturday. Prior to riding with Ligo she had driven her automobile from Greenville to Mercer with her sister as a passenger, discharged her sister at the Children's Aid Society in Mercer where she worked, and then continued to the main office. After she began riding with Ligo, she parked her car at the Children's Aid Society located west of the center of the community of Mercer on Route 62, and Ligo would pick her up there. She returned to Mer-

cer each evening with Ligo and on the return trip Ligo used the Route 62 bypass to regular Route 62 and then regular Route 62 to Mercer. Route 18 was not used on the return trip. Ligo undertook this service to Miss Langiotti purely as a gratuitous gesture, and this service was in no way related to his employment with the bank. No deviation was involved in picking up Miss Langiotti.

24. Before beginning his messenger duties at the bank in the Fall of 1969, Ligo, in the summer months and in good weather, in traveling from his home to work at the Sharon office, generally drove westwardly on Legislative Route 43099, known as the Sharpsville-Mercer Road, to the intersection of Route 18, then south on Route 18 a very short distance to Legislative Route 43117, and then west on Legislative Route 43117 into Sharon. Also, Ligo and his wife traveled to Sharon from their home about once a week in the evenings, and on these trips they generally used the Sharpsville-Mercer route. This route to Sharon is substantially the same in distance as the Route 62, Route 62 bypass course of travel.

25. Another route available to Ligo in traveling from his home to the Sharon main office was U.S. Route 80 (the Keystone Shortway), a four-lane highway. He could enter upon this highway from State Route 19 at a point a short distance south of Mercer and could leave U.S. Route 80 at the West Middlesex interchange and proceed from there north into Farrell and then into Sharon on Legislative Route 43111. Ligo and his wife had used this route on three or four occasions before Ligo's death, although this highway had been open only a short time. Ligo never used Interstate 80 for either the trip to work or the trip home from work

26. Regular Route 62 from Mercer to the Shenango Valley Mall is a two-lane highway from Mercer westwardly to its intersection with the Route 62 bypass and is heavily traveled with trucks.

27. Legislative Route 43099 is a two-lane secondary road with dirt surface of approximately five miles beginning about one mile west of the Ligo home, is less traveled and less congested than other routes, and a more pleasant drive than Route 62.

28. Legislative Route 43099 is almost two miles north of the Mall at its closest point and U.S. Route 80 is about three miles south of the Mall at its nearest point.

29. The trip to the Shenango Valley Mall office each morning required that Ligo use the Route 62 course of travel, it being the most direct and shortest route of travel to the Mall office. The messenger trips required Ligo to leave home earlier than would be the case if he were driving directly from his home to the main office.

30. Ligo's time of arrival at the Sharon main office each morning depended upon the Mall branch bank being open when he arrived there with a man available there to open the vault. The Mall branch was generally open about 8:30 a. m. so that Ligo by reason of his messenger duty could not have arranged his arrival at the main office of the bank much earlier than 9:00 a. m. in the morning had he desired to do so.

31. It was reasonably necessary for Ligo to use his automobile in the performance of his messenger duties for the bank.

32. The McDowell National Bank of Sharon, Ligo's employer, had the right to control Ligo from the time he left his home until he reached his place of regular employment in Sharon.

## DISCUSSION

■ This litigation presents a problem of interpretation. At the time of the accident, Ligo was on a trip authorized and directed by officers of the bank for the purpose of furthering the business of the bank. This trip did not constitute everyday travel to Ligo's regular place of work at the main bank in Sharon, for it required an intervening deviation to the branch office at the Shenango Valley Mall to pick up bank items. He sustained injuries resulting in his death during the course of that trip. This business trip commenced when Ligo left his residence near Mercer and the accident occurred before he reached the Shenango Valley Mall office. In our opinion, the parenthetical clause excluding coverage for injuries sustained in everyday travel to work is not applicable. If the defendant insurer had wished to exclude from coverage trips made by an insured person who was engaged in furthering the business of the bank and while he was also engaged in everyday travel to work, it should have said so.[1] The average person would understand the exclusionary clause to bar coverage for accidents occurring in the course of everyday travel to work *when the insured person is not engaged in furthering the business of the bank.* Restatement, Contracts, §§ 230, 235(a); Couch on Insurance 2d, §§ 15.73, 15.83.

It is clear that Ligo deviated from his preferred route to work by way of the Sharpsville-Mercer Road (Finding 24) by traveling through Mercer and on Route 62 in order to perform the business of the bank at the Shenango Valley Mall branch. Even if Route 62 were deemed his normal everyday travel route to work, he was required to deviate about four-tenths of a mile therefrom in order to get to the branch office in the Mall (Finding 19). *Cf.* Morningstar v. Insurance Company of North America, 295 F.Supp. 1342 (S.D.N.Y.1969).

In *Morningstar*, as here, suit was brought on a special hazards group travel policy for a death benefit. The policy covered travel on business and excluded "commutation travel", which is synony-

---

1. See limiting provision in White v. Continental Casualty Company, 414 F.2d 549 (10th Cir. 1969). In the policy sub judice a similar provision could have provided that such trip requires the insured person to travel outside the corporate limits of the municipalities in which the main bank and its several branches are located.

mous to the phrase "everyday travel to and from work". In that case, the decedent left home for work by automobile as was his custom, but, as here, he intended to make a stop for business purposes which required a substantial deviation from his normal route to work.[2] As here, his regular place of employment was not his immediate or sole destination. As here, he was accompanied by a business associate who was his usual passenger. As here, he was on the route usually traveled when the fatal accident occurred. The insurer contended that the exclusion applied. It was held that at the time of the accident, the decedent was engaged in travel for business purposes "to 'a point * * * located away from the premises of permanent assignment'", and was not at the time of the accident engaged in "commutation travel". The Court construed "commutation travel" to mean regular travel between home and office for the sole purpose of reaching the intended destination. We think "everyday travel to and from work" should receive a like construction. If the term is ambiguous, a construction must be given that is favorable to the insured. Armon v. Aetna Casualty & Surety Co., 369 Pa. 465, 468, 87 A.2d 302, 303; Frisch v. State Farm Fire & Casualty Company, 218 Pa.Super. 211, 275 A.2d 849; Simon v. Hospital Service Ass'n of Pittsburgh, 192 Pa. Super. 68, 159 A.2d 52; Couch on Insurance 2d, § 15.73. We think the Pennsylvania courts would agree with the interpretations and conclusions in *Morningstar*. The fact that Ligo, a bank officer, was required to make this business trip every working day to render messenger service, we think, is not material to the issue of coverage.

In our opinion the plaintiff has sustained her burden of proving that she is entitled to recover under the policy and that the exclusion does not apply.

2. The deviation involved was "some five minutes" in driving time to the General Foods office (Morningstar v. Insurance Company of North America, supra, p. 1344).

## CONCLUSIONS OF LAW

1. Federal jurisdiction is based on diversity of citizenship, and Pennsylvania law governs this case.

2. At the time of the accident Ligo was a Class I Insured Person covered by the special hazards group life insurance policy issued by the defendant.

3. At the time of the accident Ligo was on a trip from his residence and was engaged in furthering the business of the bank.

4. The word "work" used as a noun is ambiguous.

5. If the word "work" in the phrase "everyday travel to and from work" means any kind of work, Ligo was already at work when the accident occurred since he was performing a special errand and was on the business of the bank from the time he left his home with the mail bag.

6. The exclusion "everyday travel to and from work" does not apply to an employee who is on the business of the bank and, therefore, at work from the time he left his home each morning.

7. The word "work" in the phrase "everyday travel to and from work", reasonably construed, means the place where the employee earned his livelihood, which in this case was decedent's place of regular employment, the main office of the McDowell National Bank in Sharon, Pennsylvania.

8. The exclusion "everyday travel to and from work" was intended to apply to one traveling from his home to his place of regular employment for the sole purpose of reaching his place of regular employment. Where there is any deviation for a business purpose, the exclusion does not apply.

9. The trip by Ligo to the Shenango Valley Mall office of the bank in Hickory Township each morning involved a deviation from the shortest route of

travel in time from his home to the main office of the bank, and constituted an even greater deviation from other routes of travel available to the decedent from his home to his office in the bank at Sharon, Pennsylvania.

10. The coverage afforded under the policy to an officer does not depend on the officer performing the duties of his office at the time of the accident, the only requirement for coverage as an officer being that the Insured Person be an officer and be on the business of the bank.

11. The phrase "Officers and Managers" designated as Class I Insured Persons means either officers or managers.

12. Where an insurance policy is reasonably susceptible to two interpretations, a construction must be given that is favorable to the insured.

13. The plaintiff administratrix is entitled to recover the sum of $50,000, with interest thereon at the rate of 6% per annum from August 1, 1970.